# IN THE SUPREME COURT OF IOWA

No. 13–1960

Filed June 26, 2015

**STATE OF IOWA,**

   Appellee,

vs.

**DAMION JOHN SEATS,**

   Appellant.

---

Appeal from the Iowa District Court for Cerro Gordo County, Colleen Weiland, Judge.

A juvenile offender appeals his sentence of life in prison without the possibility of parole. **DISTRICT COURT SENTENCE VACATED AND CASE REMANDED WITH INSTRUCTIONS.**

F. David Eastman of Eastman Law Office, Clear Lake, for appellant.

Thomas J. Miller, Attorney General, and Alexandra Link, Assistant Attorney General, for appellee.

Alan Ostergren, Muscatine, for amicus curiae, Iowa County Attorneys Association.

**WIGGINS, Justice.**

A juvenile offender convicted of first-degree murder appeals his resentencing to life in prison without the possibility of parole. In this appeal, we determine the factors a court must use when it sentences a juvenile offender for first-degree murder. Because the district court did not have the benefit of this decision when it sentenced the juvenile, we vacate the sentence and remand for resentencing. We do not reach the issue as to whether a sentence of life in prison without parole categorically violates the Iowa Constitution's prohibition against cruel and unusual punishment, because we are remanding the case for resentencing.

### I. Background Facts and Proceedings.

On August 23, 2008, Damion Seats, who was seventeen years old at the time, went to a party at a friend's house in Mason City. While at the party, Seats's friend, Andre Wells revealed he had a handgun in his pocket. In the early morning hours of August 24, Seats and Wells convinced another friend, Jamie McFarland, to give them and two acquaintances a ride from the party to Reuben Ramirez's house.

Earlier that month, Seats initiated a fight with Ramirez at Ramirez's house. During the fight, Seats hit Ramirez on the head with a brick. On the evening of the party, Seats was concerned that Ramirez would report the brick incident to the police. Before leaving for Ramirez's house, Seats and Wells placed the loaded gun in the trunk of the car.

When the vehicle arrived at Ramirez's house, Seats instructed McFarland to park in the alley. Seats and Wells then tied t-shirts around their faces, retrieved the loaded handgun from the trunk, and entered the residence through a back door. When Seats and Wells entered the house Ramirez was not home, but Isidoro Cervantes Erreguin, who

stayed with Ramirez at times, and Cervantes's brother were. Both were in the living room, asleep on different couches. Seats approached the living room couch where Cervantes was sleeping and shot him five times. Four of the bullets entered Cervantes's back and the fifth entered his chest. After Seats and Wells fled, paramedics arrived at Ramirez's house and attempted to perform CPR on Cervantes. The paramedics declared Cervantes dead at the scene.

Seats and Wells returned to McFarland's waiting car. After the group left Ramirez's house, Seats wrapped the handgun in a shirt and hid it under some bushes near his brother's apartment.

On the afternoon of August 24, Seats came to the police department and asked to speak with investigators. Seats met with the case agent assigned to lead the murder investigation, Division of Criminal Investigation Special Agent Chris Callaway. Seats had reportedly heard from his friends that the police mentioned his name as a possible suspect in Cervantes's murder. Seats stated he had come to the police station voluntarily in order to clear his name. Special Agent Callaway interviewed Seats for about two hours.

Seats recounted being at a friend's party on the night of the 23rd and said he stayed there until about 3:00 a.m. on the 24th. Seats acknowledged that after the party, he, Wells, and two acquaintances got a ride from McFarland. However, according to Seats, McFarland took the two acquaintances home, then dropped off Wells in a Walmart parking lot where Wells planned to meet up with another acquaintance. Seats told Special Agent Callaway that McFarland then drove him to another friend's house where he stayed the night. Seats stated he arrived at this friend's house around 4:00 a.m. on August 24 and slept there until about 11:00 a.m. He denied any involvement in the murder. The police

permitted Seats to leave the station after the interview, but they continued to conduct surveillance on Seats.

While Special Agent Callaway was interviewing Seats, Wells came to the police department and turned over the gun Seats had hidden in the bushes. Based on Wells's version of events, the police arrested Seats that evening. The police brought Seats back to the station for another interview, this time Special Agent Callaway and Special Agent in Charge Jeff Jacobson were present and recorded the interview.

After Mirandizing Seats, the agents informed him they had recovered the gun and asked for his version of events. Seats initially continued to deny any involvement in the murder, but then told investigators he would tell them anything they wanted to know if he could speak to his girlfriend. The police allowed Seats to speak to both his girlfriend and his mother during the interview. When his mother asked him why he had shot Cervantes, he stated that he had intended to kill Ramirez to keep him from pressing charges. He went on to say, "I wasn't thinking of anybody this would've hurt if I got caught; I didn't think I was gonna get caught . . . ." After the phone call to his mother, Seats drew a diagram of Ramirez's house and indicated where he entered the house, where the occupants were sleeping, and where he stood when he shot Cervantes. Seats also told investigators he felt remorse for shooting an innocent man.

> AGENT: When did you realize it wasn't Reuben? A. Afterwards. Afterwards, like, I shot and I looked and, um, it ain't even him. And that's really what made me feel bad because that night, that dude wasn't even there. Like, he ain't even had nothing to do with that. So I killed an innocent person. That's what really ate me up, like, I killed somebody innocent who didn't have to die.

On September 9, the county attorney filed a trial information charging Seats, Wells, and McFarland jointly with first-degree murder and first-degree burglary. *See* Iowa Code §§ 707.1, .2; *id.* §§ 713.1, .3 (2009).

Notwithstanding his confession, Seats pled not guilty and went to trial separately from the other defendants. The jury found Seats guilty of both first-degree murder and first-degree burglary.

On October 26, 2009, as required by Iowa law, the court sentenced Seats to life without parole on the murder charge. *See* Iowa Code § 902.1 ("Upon a . . . verdict of guilty, . . . the court shall enter a judgment of conviction and shall commit the defendant into the custody of the director of the Iowa department of corrections for the rest of the defendant's life. . . . [A] person convicted of a class 'A' felony shall not be released on parole unless the governor commutes the sentence to a term of years."). It also sentenced Seats concurrently to twenty-five years imprisonment on the burglary conviction. *See id.* § 902.9(2). The court of appeals affirmed his convictions.

On August 17, 2011, Seats filed a motion to correct an illegal sentence. At that time, *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), was pending before the United States Supreme Court. The district court continued the hearing on Seats's motion until the Supreme Court rendered a decision. Shortly after *Miller* was decided, but before the trial court heard Seats's motion, Iowa's Governor commuted the sentences of all juveniles previously convicted of first-degree murder to a life sentence with the possibility of parole after sixty years. Seats requested and the district court granted a further postponement until we had decided a number of pending cases concerning this commutation and other aspects of juvenile sentencing.

On August 16, 2013, in *State v. Ragland*, we held the Governor's blanket commutation of the juveniles' life without parole sentences to life with eligibility for parole after sixty years did not affect the constitutional requirement that the district court proceed with an individualized hearing as required by *Miller*. *See State v. Ragland*, 836 N.W.2d 107, 121–22 (Iowa 2013). The district court scheduled an individualized resentencing hearing for Seats after the filing of the *Ragland* opinion.

In 2013, the court ordered a new presentence investigation report, which Barbara Brandt, a Mason City parole officer, prepared and filed. The report noted Seats had a difficult childhood, including a lack of adult supervision and exposure to gang violence at a very early age. It also indicated Seats had a history of homelessness and alcohol and drug abuse. The report indicated Seats had not graduated high school or completed his GED, but he had completed a literacy program while incarcerated. The report detailed Seats's juvenile criminal history. Seats told the parole officer that the majority of the people in his life had been negative influences, although some friends and associates in Mason City were positive influences. According to the report, Seats told the parole officer "[t]he difference between defendant and his co-defendants was that they had supportive family members and that wasn't the case for him."

Additionally, the report noted the prison had disciplined Seats ten times, including for fighting, for possession of intoxicants, and twice for theft and unauthorized possession. Finally, the report indicated Seats held a job during his time in prison, but as of October 29, 2013, he was not employed due to his status. However, the report stated his case manager anticipated Seats would be eligible to work again in November

2013. The report did not make a sentencing recommendation because the court had previously sentenced Seats.

The court held a resentencing hearing on November 22. The court described the purpose of the proceeding as follows:

> A series of U.S. Supreme Court cases and Iowa Supreme Court cases over the past several years have made clear that those two courts consider sentences of life without the opportunity for parole entered as to offenders who were juveniles at the time of the offense [to be] cruel and unusual punishment unless there is a consideration of individual factors. And so I believe that the parties might be presenting evidence on those individual factors today and will be arguing their positions as to what the sentence should be.

Seats testified at the hearing about his childhood. He explained his father stopped living with the family when Seats was four years old and Seats had little contact with his father growing up. Seats's father was a drug addict and used drugs when he was around Seats and his siblings. At this time, Seats has no relationship with his father.

Seats told the court as a young boy he considered his uncle a role model, even though his uncle had been in prison for drugs and attempted murder. Gang members murdered Seats's uncle in front of Seats when he was seven years old.

Seats's mother has lived in Chicago since 2006, when she returned to take care of Seats's brother who was shot in a gang incident. Prior to her return to Chicago, Seats lived with his mother, moving abruptly between Virginia, Illinois, Wisconsin, and Iowa.

After his father left, Seats's mother began a relationship with Greg, a gang member in Chicago. Greg physically abused his mother in front of Seats and his siblings. Seats remembered Greg hitting his mother in the head with a hammer.

By the time Seats was ten years old, Seats's mother had a new boyfriend, Keith, who was abusive to Seats's mother and all of the children. Keith was physically, verbally, and emotionally abusive, using household items to hit the children. Seats recalled all the children sleeping under their beds to avoid Keith's beatings. Further, while she was with Keith, Seats's mother also became abusive towards the children and at one point Seats's grandmother removed the children from their home for a few months to keep them safe. Seats reported he stayed out all night in Chicago to avoid the violence while Keith was in the home.

Seats has two brothers and one sister. Both of Seats's brothers have been imprisoned at one time for drugs and violent crimes. Seats's sister also has a history of drug use and criminal charges.

Seats was involved in gangs since the age of thirteen. When his mother moved back to Chicago in 2006 Seats stayed in Mason City, living with his brother who was approximately twenty years old. His brother allowed Seats to use cocaine, ecstasy, marijuana, and alcohol. By fifteen years old Seats was essentially homeless, staying with friends and gang members. At the age of sixteen, a rival gang shot Seats three times to get back at Seats's brother, who was in prison at the time. Seats also sold drugs as a teenager.

Seats stated he had received counseling and treatment through the juvenile court system but continued to commit the offenses noted in his juvenile record. Seats testified that some time before Cervantes's murder he had worked for two weeks at a grocery store but decided he did not want to do that and quit. Seats also continued to deny murdering Cervantes. As he put it, "[I]t didn't happen." Seats informed the court he was taking steps to better himself, such as being more patient and trying to control his drug and alcohol addictions. He testified he would take full

advantage of opportunities to finish his GED and learn a job if they were made available to him.

At the sentencing hearing, Seats asked for immediate parole eligibility and for the court to "rely on the parole board to determine when [he] or anybody in his position has developed to the point where he is no longer a threat to society and would be a productive member of society." He also urged the court to impose a term-of-years sentence, rather than a life term, because it would allow Seats to earn good time on his sentence and "the good time is an incentive for him to accomplish the very things that we are talking about right now . . . to get the parole that he would be seeking."

The State argued Seats's case warranted a sentence of life without parole. It urged the concern for juvenile brain development is less in a case where the offender, like Seats, was just months away from his eighteenth birthday. It maintained that the nature of Seats's crime and the surrounding circumstances did not support a finding that it was the result of youthful incompetency. Finally, the State pointed to Seats's extensive juvenile record, his disciplinary violations in prison, and the fact that he still denied responsibility for the murder as evidence that he was not amenable to rehabilitation.

At the conclusion of the hearing, the district court indicated it would take the weekend to consider the testimony and evidence before rendering a decision on Seats's resentencing. Four days later, the court issued its decision on the record. The court stated it was conducting a resentencing based on statutory factors and the factors set forth in *Miller*:

> [T]he court is to consider all pertinent information, including the presentence investigation report and victim impact

statements. "All pertinent information" includes the nature of the offense and the defendant's character, propensity to reoffend, chances for reform, age, family circumstances, need for mental health treatment, need for substance abuse treatment, history of suffering abuse, employment history, criminal history, behavior while on probation or while incarcerated, remorse or lack thereof, and concern about the victims or lack thereof. . . . In regard to a juvenile defendant, the court must also weigh the defendant's age and age-attendant characteristics against the seriousness of the crime. . . . It must take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

Applying these considerations, the court stated this was one of the "unusual" cases warranting life without parole. The court addressed Seats's personal characteristics and potential for reform, using his childhood circumstances, the negative family influences in his life, and his lack of a stable support system as a factor against him:

When he killed Isidro Cervantes Erreguin, Mr. Seats was only months away from being an adult. He already had a history of juvenile criminal activity. Previous interventions and attempts at rehabilitation had failed. Mr. Seats has shown no ability or willingness to maintain employment. He has shown little ability to abstain from the use of alcohol and controlled substances, and he has no family or other support outside of the criminal community. He has not made significant rehabilitative efforts in prison, and has instead incurred ten major disciplinary reports.

The court went on to discuss the nature of Seats's crime. The court acknowledged Seats's troubled youth, but concluded it did not outweigh the serious nature of Seats's crime and behavior:

I have considered the defendant's unfortunate background and the difficulties he faced in his youth. I am not unsympathetic to the bleakness and desperation of that life. But I fail to find here the "attendant characteristics" of youth that might outweigh the seriousness of the crime or otherwise require a less sentence than one that would be imposed on an adult.

Ultimately, the court granted Seats's motion to correct the illegal sentence "[t]o the extent the previous sentence was imposed without individualized consideration of the circumstances."  It otherwise denied the motion and upheld Seats's sentence of life with parole eligibility after sixty years as commuted by the governor.

Seats appealed, and we retained the appeal.

**II.  Issues.**

The defendant raises three issues on appeal.  First, whether the district court's imposition of life in prison without the possibility of parole categorically violates article I, section 17 of the Iowa Constitution, which prohibits cruel and unusual punishment.  Next, if it does not, does the sentence imposed by the court upholding the Governor's commutation of his original sentence to sixty years before he is eligible for parole violate article I, section 17 of the Iowa Constitution.  Third, whether the sentence of life without the possibility of parole, even after discarding the Governor's commutation, as applied to the facts of this case constitute cruel and unusual punishment.  We can resolve this appeal by addressing the last issue.

**III.  Standard of Review.**

We have expressed three different standards of review when a defendant challenges his or her sentence on appeal.  We use the abuse of discretion standard if the sentence is within the statutory limits.  When reviewing a sentence for an abuse of discretion, we have said:

> In applying the abuse of discretion standard to sentencing decisions, it is important to consider the societal goals of sentencing criminal offenders, which focus on rehabilitation of the offender and the protection of the community from further offenses.  It is equally important to consider the host of factors that weigh in on the often arduous task of sentencing a criminal offender, including the nature of the offense, the attending circumstances, the age,

character and propensity of the offender, and the chances of reform. . . . The application of these goals and factors to an individual case, of course, will not always lead to the same sentence. Yet, this does not mean the choice of one particular sentencing option over another constitutes error. Instead, it explains the discretionary nature of judging and the source of the respect afforded by the appellate process.

Judicial discretion imparts the power to act within legal parameters according to the dictates of a judge's own conscience, uncontrolled by the judgment of others. It is essential to judging because judicial decisions frequently are not colored in black and white. Instead, they deal in differing shades of gray, and discretion is needed to give the necessary latitude to the decision-making process. This inherent latitude in the process properly limits our review. Thus, our task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds.

*State v. Formaro*, 638 N.W.2d 720, 724–25 (Iowa 2002) (citations omitted). In other words, a district court did not abuse its discretion if the evidence supports the sentence. *State v. Valin*, 724 N.W.2d 440, 445 (Iowa 2006).

We also review sentences for correction of errors at law. We do so when the defendant challenges the legality of a sentence on nonconstitutional grounds. *Id.* at 443–44. We use the correction of errors at law standard when the statute does not authorize the sentence. *State v. Freeman*, 705 N.W.2d 286, 287 (Iowa 2005).

More recently, we have begun to decide cases involving constitutional attacks on the validity of a sentence. *See Ragland*, 836 N.W.2d at 109–10 (examining whether a defendant's sentence amounts to cruel and unusual punishment under the Iowa Constitution); *State v. Pearson*, 836 N.W.2d 88, 89 (Iowa 2013) (same); *State v. Null*, 836 N.W.2d 41, 45 (Iowa 2013) (same); *State v. Bruegger*, 773 N.W.2d 862, 866, 886 n.9 (Iowa 2009) (same). When a defendant attacks the

constitutionality of a sentence, our review is de novo. *Ragland*, 836 N.W.2d at 113; *Pearson*, 836 N.W.2d at 94; *Null*, 836 N.W.2d at 48; *Bruegger*, 773 N.W.2d at 869.

Therefore, we apply the de novo standard to this appeal because Seats is attacking his sentence on constitutional grounds.

**IV. Analysis.**

The United States Supreme Court decided that although a sentencing court has the discretion to sentence a juvenile offender who commits murder to the harshest penalty possible—life in prison without the possibility of parole—such a sentence should be uncommon. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. Here, the district court sentenced Seats to the harshest sentence. Seats argues this is not the uncommon circumstance to do so. To analyze Seats's argument, we review the Supreme Court cases dealing with juvenile sentencing as well as recent cases under the Iowa Constitution dealing with cruel and unusual punishment in the juvenile context.

**A. United States Supreme Court Jurisprudence.** *Miller* is the most recent Supreme Court opinion dealing with the sentencing of juvenile offenders to life in prison without parole when the juvenile commits a murder. Before *Miller*, the Court decided *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) and *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

In *Roper*, the Supreme Court held executing juveniles who had committed capital crimes violated the Eighth and Fourteenth Amendments of the United States Constitution. 543 U.S. at 578, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28. The seventeen-year-old defendant in *Roper* took a woman from her home, tied her up—with duct tape covering

her head and wire binding her extremities—and threw her into a river to drown.  *Id.* at 556–57, 125 S. Ct. at 1187–88, 161 L. Ed. 2d at 13.

In support of its holding, the Court recognized three general differences between juveniles and adults that "render suspect any conclusion that a juvenile falls among the worst offenders."  *Id.* at 569–70, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21–22.  First, juveniles have " '[a] lack of maturity and an underdeveloped sense of responsibility.' "  *Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21 (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 2668, 125 L. Ed. 2d 290, 306 (1993)).  The Court recognized these characteristics " 'often result in impetuous and ill-considered actions and decisions.' "  *Id.* (quoting *Johnson*, 509 U.S. at 367, 113 S. Ct. at 2668, 125 L. Ed. 2d at 306).  Second, juveniles are more susceptible than adults are to "negative influences and outside pressures" and "juveniles have less control, or less experience with control, over their own environment."  *Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22.  Third, a juvenile's personality and character traits are still forming, and are not as fixed as an adult's personality and character traits are.  *Id.* at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22.  As a result of these differences, there is a greater possibility "that a minor's character deficiencies will be reformed" and " 'the impetuousness and recklessness that may dominate in younger years can subside.' "  *Id.* at 570, 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 22 (quoting *Johnson*, 509 U.S. at 368, 113 S. Ct. at 2668, 125 L. Ed. 2d at 306).

Next, in *Graham*, the Court held the Eighth Amendment prohibits states from sentencing juveniles who did not commit homicide to life in prison without parole, and the states sentencing these juveniles to a life sentence must provide a "realistic opportunity to obtain release before

the end of that term." 560 U.S. at 82, 130 S. Ct. at 2034, 176 L. Ed. 2d at 850. The defendant in *Graham* committed a number of criminal offenses including armed burglary, armed robbery, and fleeing from police. *Id.* at 53–55, 130 S. Ct. at 2018–19, 176 L. Ed. 2d at 832–33.

The Court relied upon the reasoning articulated in *Roper* regarding juveniles' underdeveloped sense of responsibility and lack of maturity to demonstrate that "[a] juvenile is not absolved of responsibility for his actions, but his transgression 'is not as morally reprehensible as that of an adult.'" *Id.* at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835, 108 S. Ct. 2687, 2699, 101 L. Ed. 2d 702, 719 (1988) (plurality opinion)). The Court went on to recognize "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds . . . [and the] parts of the brain involved in behavior control continue to mature through late adolescence." *Id.* The Court also identified that juveniles are more capable of changing their character and reforming than adults are. *Id.* at 68, 130 S. Ct. at 2026–27, 176 L. Ed. 2d at 841–42. The Court noted for juveniles a life sentence without parole

> means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.

*Id.* at 70, 130 S. Ct. at 2027, 176 L. Ed. 2d at 842 (internal quotation marks omitted). Further, the Court in both *Graham* and *Roper* determined none of the penological justifications for sentencing—retribution, deterrence, incapacitation, or rehabilitation—are served when imposing either of these sentences on juveniles. *Graham*, 560 U.S.

at 71–74, 130 S. Ct. at 2028–30, 176 L. Ed. 2d at 843–45; *Roper*, 543 U.S. at 571–72, 125 S. Ct. at 1196–97, 161 L. Ed. 2d at 23.

In *Miller*, the Court decided it did not have to reach a categorical challenge to a sentence of life in prison without parole for a juvenile who commits murder as it did in *Roper* and *Graham*. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. at 424. The Court did not reach the categorical challenge because its holding was sufficient to decide the cases before the Court in *Miller*. *Id*. In not addressing the categorical challenge, the Court made it clear that the "appropriate occasions for sentencing juveniles to this harshest possible penalty, [life in prison without the possibility of parole,] will be uncommon." *Id*. The *Miller* Court required judges or juries "must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id*. at ___, 132 S. Ct. at 2475, 183 L. Ed. 2d at 430.

In reaching this decision, the Court built on its jurisprudence espoused in *Roper* and *Graham*. In *Miller*, the court reiterated there is a significant constitutional difference between children and adults that "diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id*. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419. This is

> especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id*. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 (quoting *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24).

**B.  Application of Supreme Court Jurisprudence to Juveniles in Iowa.**  We have previously discussed the role *Roper*, *Graham*, and *Miller* play in sentencing a juvenile subject to a mandatory minimum sentence for a nonhomicide crime.  *Null*, 836 N.W.2d at 74–75.  In a case in which the court has discretion to sentence a juvenile to life in prison without the possibility of parole, *Miller* and *Null* require the sentencing judge to consider the following factors before sentencing a juvenile to life in prison without the possibility of parole.

First, the court must start with the Supreme Court's pronouncement that sentencing a juvenile to life in prison without the possibility of parole should be rare and uncommon.  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424; *Null*, 836 N.W.2d at 75. Thus, the presumption for any sentencing judge is that the judge should sentence juveniles to life in prison with the possibility of parole for murder unless the other factors require a different sentence.

Second, the sentencing judge must recognize that "children are constitutionally different from adults."  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418.  We have explained, "The constitutional difference arises from a juvenile's lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile's character."  *Null*, 836 N.W.2d at 74; *see also Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418.

In sentencing the juvenile offender, the court must take in account any information in the record regarding "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional."  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423.  In examining the "family and home environment," the judge shall consider any information

regarding childhood abuse, parental neglect, personal and family drug or alcohol abuse, prior exposure to violence, lack of parental supervision, lack of an adequate education, and the juvenile's susceptibility to psychological or emotional damage. *People v. Gutierrez*, 324 P.3d 245, 268–69 (Cal. 2014). The sentencing judge should consider these family and home environment vulnerabilities together with the juvenile's lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure as mitigating, not aggravating factors. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467–69, 183 L. Ed. 2d at 422–24; *Null*, 836 N.W.2d at 74–75.

Third, the sentencing judge must consider "the circumstances of the homicide offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected him." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423. One of the circumstances the sentencing judge needs to consider is whether substance abuse played a role in the juvenile's commission of the crime. *Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 423.

Finally, the sentencing judge must take into consideration that "[j]uveniles are more capable of change than are adults" and that as a result, "their actions are less likely to be evidence of 'irretrievably depraved character.'" *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841 (quoting *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22). "[M]ost juveniles who engage in criminal activity are not destined to become lifelong criminals." *Null*, 836 N.W.2d at 75; *see also Graham*, 560 U.S. at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841; *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 22. As we said in *Null*, a case decided under the Iowa Constitution, "incorrigibility is inconsistent with youth, care should be taken to avoid an irrevocable

judgment about [an offender's] value and place in society." *Null*, 836 N.W.2d at 75 (internal quotation marks omitted). It is very difficult for a judge to distinguish between " 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 (quoting *Roper*, 543 U.S. at 573, 125 S. Ct. at 1193, 161 L. Ed. 2d at 24). The sentencing judge should only sentence those juveniles to life in prison without the possibility of parole whose crime reflects irreparable corruption.

We note the district court emphasized that Seats was a seventeen-year-old at the time the crime was committed. We recognize that in *Roper*, the line between being a juvenile and an adult was drawn for cruel and unusual punishment purposes at eighteen years of age. *See Roper*, 543 U.S. at 574, 125 S. Ct. at 1197–98, 161 L. Ed. 2d at 24–25. Yet, as we stated in *Null*, current science demonstrates that the human brain continues to develop into the early twenties. 836 N.W.2d at 55. As stated by two leading scholars in adolescent development and the law, "[t]he research clarifies that substantial psychological maturation takes place in middle and late adolescence and even into early adulthood." Elizabeth S. Scott & Lawrence Steinberg, *Rethinking Juvenile Justice* 60 (2008). Thus, Scott and Steinberg emphasize that "adolescents, even at age sixteen and seventeen, are immature in their psychosocial and emotional development, and this likely affects their decisions about involvement in crime in ways that distinguish them from adults." *Id.* at 131. In light of the science, the fact that a defendant is nearing the age of eighteen does not undermine the teachings of *Miller* and *Null*.

We must be cognizant of the fact that a sentence of life in prison without the possibility of parole for a juvenile is the equivalent of the death penalty for juveniles. As *Graham* so aptly observed,

> Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation.

*Graham*, 560 U.S. at 79, 130 S. Ct. at 2032, 176 L. Ed. 2d at 848.

Even if the judge sentences the juvenile to life in prison with parole, it does not mean the parole board will release the juvenile from prison. Once the court sentences a juvenile to life in prison with the possibility of parole, the decision to release the juvenile is up to the parole board. Iowa Code § 904A.4 (2015). If the parole board does not find the juvenile is a candidate for release, the juvenile may well end up serving his or her entire life in prison.

In *Null*, we found when a judge sentences a juvenile to a mandatory minimum sentence, the judge must state his or her reasons on the record for imposing such a sentence. *Null*, 836 N.W.2d at 71, 74. Likewise, if the sentencing judge believes the information in the record rebuts the presumption to sentence a juvenile to life in prison with the possibility of parole and the case is the rare and uncommon case requiring the judge to sentence the juvenile to life in prison without the possibility of parole, the judge must make specific findings of fact discussing why the record rebuts the presumption. "In making such findings, the district court must go beyond a mere recitation of the nature of the crime, which the Supreme Court has cautioned cannot overwhelm the analysis in the context of juvenile sentencing." *Id.* at 74–75.

**C. Application of Supreme Court Jurisprudence to Seats.** On our de novo review, we note the district did not consider the factors a court must consider before sentencing a juvenile to life in prison without the possibility of parole. Factually, the district court appeared to use Seats's family and home environment vulnerabilities together with his lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure as aggravating, not mitigating factors.

At the time of sentencing, the district court did not have the benefit of this decision setting forth the factors the court must use and the requirements the court needs to sentence a juvenile convicted of first-degree murder. When this happens, the proper remedy is to remand the case back to the district court to consider the matter consistent with our holding in this opinion. *State v. Hildebrand*, 280 N.W.2d 393, 397 (Iowa 1979).

Additionally, we need not reach the issue as to whether sentencing a juvenile to life in prison without the possibility of parole categorically violates the Iowa Constitution's prohibition on cruel and unusual punishment because we are sending this case back to the district court for resentencing. Upon resentencing, if the district court finds this is the rare and uncommon case requiring it to sentence Seats to life in prison without the possibility of parole, Seats can appeal his sentence as contrary to *Miller*. In that appeal, he can make the additional claim that his sentence of life in prison without the possibility of parole categorically violates the Iowa Constitution's prohibition on cruel and unusual punishment.

**V. Summary and Disposition.**

There is no question that juveniles who commit vicious murders deserve severe punishment. However, we cannot lose sight of the fact

that juveniles are different from adults due to a juvenile's lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile's character. The question the court must answer at the time of sentencing is whether the juvenile is irreparably corrupt, beyond rehabilitation, and thus unfit ever to reenter society, notwithstanding the juvenile's diminished responsibility and greater capacity for reform that ordinarily distinguishes juveniles from adults. Therefore, we must remand this case for resentencing consistent with this opinion.

**DISTRICT COURT SENTENCE VACATED AND CASE REMANDED WITH INSTRUCTIONS.**

Cady, C.J., and Hecht and Appel, JJ., join this opinion. Hecht, J., files a separate concurring opinion. Mansfield, J., files a dissenting opinion in which Waterman and Zager, JJ., join.

**HECHT, Justice (concurring specially).**

"[C]hildren are constitutionally different from adults . . . ." *Miller v. Alabama,* 567 U.S. ___, ___, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407, 418 (2012); *see also State v. Lyle,* 854 N.W.2d 378, 390, 402 & n.8 (Iowa 2014); *State v. Ragland,* 836 N.W.2d 107, 119, 121 (Iowa 2013); Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 5 Ann. Rev. Clinical Psychol. 459, 481 (2009) [hereinafter Steinberg] ("[A]s a class, adolescents are inherently less blameworthy than adults."). I join today's opinion because it recognizes this principle. However, I also write separately because in my view, children are so different that article I, section 17 of the Iowa Constitution categorically prohibits sentencing them to life without parole.

As the United States Supreme Court recognized in *Roper v. Simmons*, there are significant differences between juveniles and adults that "render suspect any conclusion that a juvenile falls among the worst offenders." *Roper v. Simmons,* 543 U.S. 551, 570, 125 S. Ct. 1183, 1195, 161 L. Ed. 2d 1, 22 (2005). Juveniles are impetuous; they lack maturity; and they possess an underdeveloped sense of responsibility. *See id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22. Their incomplete maturation makes juveniles especially vulnerable to "negative influences and outside pressures." *Id.* This vulnerability is attributable in part to juveniles' character and personality traits which "are more transitory [and] less fixed" than those of adults. *Id.* at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22. "[Y]outh is more than a chronological fact." *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S. Ct. 869, 877, 71 L. Ed. 2d 1, 11 (1982). "It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' " *Miller,* 567 U.S. at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d

at 422 (alteration in original) (quoting *Johnson v. Texas,* 509 U.S. 350, 368, 113 S. Ct. 2658, 2669, 125 L. Ed. 2d 290, 306 (1993)).

For these reasons and others, we recognize that children are constitutionally different because it is impossible to know when they are beyond rehabilitation. *See Roper,* 543 U.S. at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22 ("The reality that juveniles . . . struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character."); *see also Miller,* 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419 ("[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."). "[W]e cannot claim that adolescents 'ought to know better' if, in fact, the evidence indicates that they do not know better, or more accurately, cannot know better, because they lack the abilities needed to exercise mature judgment." Steinberg, 5 Ann. Rev. Clinical Psychol. at 471.

Although the Supreme Court initially considered these differences in deciding a case involving the death penalty, it later noted their significance in reviewing sentences of life without parole (LWOP) challenged under the Eighth Amendment. *See Graham v. Florida,* 560 U.S. 48, 68, 130 S. Ct. 2011, 2026, 176 L. Ed. 2d 825, 841 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence."). More recently, the Court considered the importance of the characteristics of youth in reviewing an LWOP sentence imposed on a juvenile offender convicted of homicide. *See Miller,* 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418–19. In

*Miller*, the court struck down as unconstitutional under the Eighth Amendment a mandatory LWOP sentence that was imposed without consideration of the defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423. The Court also struck down the sentence because it failed to take account of "the family and home environment that surround[ed the defendant] . . . no matter how brutal or dysfunctional." *Id.* "And finally, th[e] mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.*

We have concluded juvenile offenders are also different for purposes of sentencing under article I, section 17 of the Iowa Constitution. *See State v. Null*, 836 N.W.2d 41, 54–56, 70 (Iowa 2013). The majority recognizes as much, but stops short of concluding an LWOP sentence is categorically unconstitutional for offenses committed by juvenile offenders. I am prepared to go there now because I do not believe we can develop or identify a principled standard for predicting which juvenile offenders are capable of maturation and rehabilitation and which ones are not.

My conclusion that article I, section 17 mandates a categorical ban of LWOP sentences for juvenile offenders is based on several considerations. I first note that an LWOP sentence for a juvenile offender is tantamount to a death penalty in the sense that both sentences are based on a conclusive determination that the offender will never be rehabilitated and able to contribute meaningfully to society. *See Graham*, 560 U.S. at 69, 130 S. Ct. at 2027, 176 L. Ed. 2d at 842 (noting either type of sentence "alters the offender's life by a forfeiture that is irrevocable"); *Diatchenko v. Dist. Att'y*, 1 N.E.3d 270, 284 (Mass. 2013)

("When considered in the context of the offender's age and the wholesale forfeiture of all liberties, the imposition of [LWOP] on a juvenile homicide offender is strikingly similar, in many respects, to the death penalty . . . ."). Any sentencing scheme that permits such a conclusive determination before the juvenile's potential for maturation and rehabilitation can be reliably known or predicted is in my view intrinsically disproportionate and therefore cruel and unusual.

I acknowledge the Supreme Court has not yet adopted my position that a categorical ban on LWOP sentences for homicide offenses is constitutionally required.[1] In *Miller*, the Court only held unconstitutional mandatory LWOP sentences that are imposed without individualized consideration of an offender's youthful characteristics. *Miller,* 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 ("[T]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. . . . [W]e do not consider [the] alternative argument that the Eighth Amendment requires a categorical bar on [LWOP] for juveniles . . . ."). The Supreme Court left open the possibility that a juvenile could, consistent with the Eighth Amendment, be sentenced to LWOP, but noted "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* I would reach a different conclusion under article I, section 17 of the Iowa Constitution because I have no confidence that a principled standard can be developed to distinguish an "uncommon

---

[1]A petition for certiorari currently before the Supreme Court raises that question in part; the question presented is whether "the Eighth Amendment's ban on cruel and unusual punishment forbid[s] sentencing a child to [LWOP] when that child has been convicted of felony murder despite not having killed or intended to kill." Petition for Writ of Certiorari at i, *Davis v. Michigan,* No. 14–8106 (U.S. Jan. 20, 2015). Although *Davis* only involves a subcategory of homicide offenses, it nonetheless establishes that this issue continues to arise.

occasion" justifying an irrevocable determination of LWOP from other occasions in which a possibility of parole is required.

Other jurists have shared my lack of confidence in our ability to conceive—or in sentencing courts' ability to apply consistently—a principled standard for identifying the uncommon or rare circumstances justifying LWOP for a juvenile offender. *See Graham*, 560 U.S. at 77, 130 S. Ct. at 2032, 176 L. Ed. 2d at 847 (doubting "that courts taking a case-by-case . . . approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change"); *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24 ("It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."); *Diatchenko*, 1 N.E.3d at 284 (noting that when sentencing juveniles, "the judge cannot ascertain, with any reasonable degree of certainty, whether imposition of th[e] most severe punishment is warranted"). "[E]ven for juveniles who commit murder, their moral culpability compared to adults remains diminished by their age . . . , and they, therefore, are still less deserving, as a categorical matter, of the most severe punishments." Mary Berkheiser, *Developmental Detour: How the Minimalism of* Miller v. Alabama *Led the Court's "Kids Are Different" Eighth Amendment Jurisprudence Down a Blind Alley*, 46 Akron L. Rev. 489, 501–02 (2013) [hereinafter Berkheiser]; *see also* Aryn Seiler, Note, *Buried Alive: The Constitutional Question of Life Without Parole for Juvenile Offenders Convicted of Homicide*, 17 Lewis & Clark L. Rev. 293, 321 (2013) ("[T]he culpability of the juvenile offender is diminished in the homicide case just as it is diminished in the non-homicide case. Culpability belongs to the offender, not the offense.").

Let us suppose that any standard for identifying an "uncommon" case justifying LWOP might call for consideration of the heinous nature of the juvenile offender's crime. This factor is problematic for multiple reasons. First, as the Supreme Court has noted, "[a]n unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course." *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24. But even more problematic in my view is the fact that the heinousness of a juvenile's crime is likely to be causally connected with the very attributes and disabilities of youth which cause some folks to cringe at the prospect of LWOP sentences for juvenile offenders. As this court has previously noted, juveniles often fail to appreciate risks and are susceptible to peer pressure; they tend to act impetuously without contemplating the consequences of their behavior. *See Null*, 836 N.W.2d at 54–56. Thus, the very attributes and disabilities making youth constitutionally different are causal factors increasing the likelihood of heinous behavior. Accordingly, I think it cannot be sensible to suggest that a principled standard for identifying the uncommon case deserving an LWOP should include the heinousness of a juvenile offender's crime.

Other potential factors that might be considered in any standard for identifying the uncommon case suitable for an LWOP sentence are similarly problematic. Consider, for example, the juvenile offender's age. Do we really believe a sentencing court can make a principled distinction between an offender who is fifteen years old and another who is seventeen years old in assessing relative capacities for maturation and rehabilitation? Given what we now know about the incompleteness of brain development during adolescence, I believe the court's ability to

predict such capacities of juvenile offenders is largely based on sheer speculation at either age.

Another sentencing consideration commonly included in the analysis of whether an LWOP might be appropriate for a juvenile offender convicted of homicide is whether the offender experienced severe abuse or neglect as a child. But should a juvenile offender's history of horrific abuse or neglect augur in favor of or against LWOP when he or she is sentenced for a homicide? The juvenile offender with such a history of deprivation might be viewed as less culpable than another who was raised in a stable home with caring parents. Yet, the horrifically deprived and abused juvenile offender might have been so deeply scarred by the circumstances of his or her young life that rehabilitation might be a very doubtful and distant prospect.

I suggest the picture is no clearer in the case of the juvenile offender who was raised in a stable home with caring parents. Should the sentencing court conclude this offender found guilty of homicide is more culpable than the child whose family life was characterized by chaos and deprivation? Perhaps; but even if the sentencing court views him as morally more blameworthy, might he nonetheless have better prospects for maturation and rehabilitation because he does not carry the deep scars of deprivation—and might he therefore be a better candidate for parole than our less fortunate hypothetical offender? No matter how the sentencing court might answer these extremely challenging questions, it cannot predict with reasonable certainty which juvenile offender will in fact mature and develop the capacity to become a contributing member of society. Only time will tell.

History shows us that some juvenile offenders convicted of homicide make remarkable progress toward maturity and rehabilitation

over time during incarceration. To illustrate this phenomenon, one need only look to *State v. Louisell*, ___ N.W.2d ___ (Iowa 2015), also decided today. Louisell endured a difficult and chaotic childhood before attending college in Iowa beginning in 1987. *Id.* at ___. She was convicted of first-degree murder after befriending an older, physically handicapped art student, stabbing him in his home, and stealing his wallet. *Id.* at ___. A jury found she committed a premeditated and deliberate crime. *Id.* at ___; *see* Iowa Code § 707.2(1) (1987). Yet, during her time in prison, Louisell earned an associate's degree and a bachelor's degree, learned a trade, became a published author, and became a mentor and tutor for other incarcerated women. *Louisell*, ___ N.W.2d at ___. In 1988, when Louisell was sentenced to LWOP, few if any participants in the proceedings would have predicted Louisell would shed the disabilities of youth given the nature of her crime. Yet, her accomplishments since then demonstrate that an LWOP determination should not focus on *missed* opportunities to mature during childhood and adolescence, but on the possibility that a juvenile offender convicted of the most serious of offenses might capitalize on *future* ones while in prison. Because an irrevocable LWOP determination by a sentencing court is fraught with so much uncertainty attending the juvenile offender's potential for maturation and rehabilitation, I conclude article I, section 17 mandates prohibition of LWOP sentences for all juveniles convicted of homicide offenses.

Some have contended LWOP should remain available as a sentencing option for juvenile offenders convicted of homicides committed after thinking and planning. *See People v. Carp*, 852 N.W.2d 801, 843 (Mich. 2014) ("Because some juvenile offenders . . . form an unequivocal premeditated intent to kill in the face of the consequences, it

is not categorically disproportionate to punish at least some juvenile offenders the same as adults."). To be sure, the circumstances of Seats's crime suggest he engaged in some deliberation before committing the offense in this case. He knew his friend had a gun, arranged transportation to the victim's residence, and acted at night when the victim would likely be sleeping. These facts are certainly chilling, just like the facts in *Roper*. *See Roper*, 543 U.S. at 556–57, 125 S. Ct. at 1187–88, 161 L. Ed. 2d at 13 (noting the defendant instigated a plan to commit burglary and murder, acted at night, and threw the victim off a bridge after wrapping her face in duct tape). "But the Constitution does not permit subjective gut reactions to define the sentencing of our young." Berkheiser, 46 Akron L. Rev. at 508.

Furthermore, the circumstances of Seats's crime also highlight the frailty of juvenile reasoning and the undeveloped juvenile capacity to understand the horrible and permanent consequences of behavior. *See* Steinberg, 5 Ann. Rev. Clinical Psychol. at 467 ("[D]espite the fact that in many ways adolescents may appear to be as intelligent as adults . . . , their ability to regulate their behavior in accord with these advanced intellectual abilities is more limited."). Seats worried that he would be reported for committing a crime, so he decided to commit another, more serious crime. He acted so impetuously that he did not even verify he had encountered his intended victim before firing multiple shots. He contacted a police investigator because he "had heard" he was a suspect in the murder and wanted to clear his name, apparently believing his friendly outreach would remove any suspicion the police otherwise had. I recognize there is no assurance that these traits will resolve as Seats ages and matures. Nonetheless, I believe no sentencing court should be able to deprive him of an opportunity, at some point in the future, to

demonstrate that they have. *See Graham,* 560 U.S. at 79, 130 S. Ct. at 2032, 176 L. Ed. 2d at 848 ("Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation.").

One other state—Massachusetts—has already determined that juvenile LWOP sentences are categorically prohibited under its state constitution. *Diatchenko,* 1 N.E.3d at 284–85 ("[W]e conclude that the discretionary imposition of [LWOP] on juveniles who are under the age of eighteen when they commit murder in the first degree violates the [constitutional] prohibition against 'cruel or unusual punishment' . . . ."). In doing so, the Supreme Judicial Court of Massachusetts relied on two analytical pillars I would adopt here: first, that the "back end" parole board mechanism better accommodates juveniles' capacity for change than a "front end" irrevocable LWOP determination; and second, that juveniles have diminished culpability no matter the offense they commit. *See id.* at 282–85. Iowa should join Massachusetts on the path it has forged.[2]

---

[2]Some other states have legislatively abolished LWOP for juveniles. *See, e.g.*, Haw. Rev. Stat. Ann. § 706-656(1) (West, Westlaw through June 3, 2015) ("Persons under the age of eighteen years at the time of the offense who are convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment with the possibility of parole."); W. Va. Code Ann. § 61-11-23(a)(2) (West, Westlaw through 2015 Reg. Sess.) ("Notwithstanding any other provision of law to the contrary, a sentence of [LWOP] may not be imposed on a person who . . . [w]as less than eighteen years of age at the time the offense was committed."); Wyo. Stat. Ann. § 6-2-101(b) (West, Westlaw through 2014 Budget Sess.) ("A person convicted of murder in the first degree shall be punished by death, life imprisonment without parole or life imprisonment according to law, except that a person convicted of murder in the first degree who was under the age of eighteen (18) years at the time of the offense shall be punished by life imprisonment."); *see also* Tex. Penal Code Ann. § 12.31(a) (West, Westlaw through 84th Legis., ch. 46 of 2015 Reg. Sess.) (distinguishing between "life" for juvenile offenders and "life without parole" for adult offenders).

Juvenile justice evolves in incremental steps. *See State v. Pearson*, 836 N.W.2d 88, 99 (Iowa 2013) (Cady, C.J., concurring specially). Given the foundation of diminished juvenile culpability and the reasoning set forth in *Roper, Graham, Miller, Diatchenko*, and our decisions based on article I, section 17 of the Iowa Constitution, the categorical rule I propose in this case is merely the final increment. Because children are constitutionally different, I believe a sentence of life without parole "may not be imposed on [them] . . . no matter how heinous the crime." *Roper*, 543 U.S. at 568, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21. Accordingly, I concur in my colleagues' determination that Seats must be resentenced.

**MANSFIELD, Justice (dissenting).**

This is a difficult case presenting two important issues: First, are life-without-parole sentences for juvenile murderers *categorically* unconstitutional? Second, even if such sentences are not categorically unconstitutional, do the facts of *this case* permit such a sentence?

Unfortunately, the court decides neither issue. Instead, it remands the case for an unneeded procedural do-over in which the district court is directed to reapply caselaw it has already applied. This remand not only leaves the present case unresolved, but also provides no helpful guidance to our district courts in other juvenile sentencing cases.

I would not avoid the hard issues this case presents. I would hold, consistent with the decisions of federal appellate courts and all but one state appellate court, that life-without-parole sentences in juvenile homicide cases are not always unconstitutional. I would also hold that under the facts of this case, the district court could constitutionally exercise its discretion to impose a life-without-parole sentence.

Reasonable people can disagree on these matters. But whatever our views may be, I think we ought to come to a decision. We should not leave district courts, defendants, victims, prosecutors, defense attorneys, legislators, and the public in the lurch.

Deciding the appellant's categorical challenge takes on added importance here because the legislature has recently passed a law that retains life without parole as a sentencing option for juveniles who commit first-degree murder. Is that law constitutional? We should say yes or no today, in a case where the issue is squarely presented by the parties.

The court justifies its failure to reach a decision by maintaining that when there are alternative grounds raised on appeal, it only needs to reach one of them. That position has a problem here, however. The relief granted by the majority (a remand for a do-over) is less than the full relief requested by the appellant (vacating the LWOP sentence with no possibility of its being reinstated). Normally, appellate courts do not decline to reach an argument on appeal just because they have reached other arguments that grant *lesser* relief.

Otherwise stated, it would not be dictum for the court to decide whether Seats can be sentenced to LWOP at all. Rather, it is an abdication of our responsibility not to reach this issue.

### I. Additional Relevant Facts.

I will try to avoid repeating facts stated in the majority opinion, but will discuss some additional facts that are relevant to the appellant's as-applied challenge to his sentence.

Damion Seats was just a few months shy of eighteen years old on August 23, 2008, when he went to a party at a friend's trailer in Mason City. Although other people at the party were drinking alcohol and smoking marijuana, Seats was not under the influence of any substances. At the party, Seats and his friend, Andre Wells, handled Wells's handgun and its bullets and discussed robbing "R[e]uben [Ramirez] and the Mexicans." Seats asked Wells for assurance that the clip was not going to jam. Wells responded that it shouldn't.

Before leaving the party, Seats and Wells convinced another friend, Jamie McFarland, to give them a ride to Ramirez's house. When McFarland warned Seats the two of them would get caught, Seats replied, "[D]ead people don't talk."

As explained by the majority, upon entering Ramirez's house, Seats mistook the sleeping victim, Isidoro Cervantes Erreguin, for Ramirez. Seats shot Cervantes five times from a distance of a few feet. Cervantes died as a result of his wounds.

Seats and Wells then returned to the waiting car. Seats stated he had "just shot two Mexicans" and "emptied the whole clip." Seats later returned to the party and indicated that if the cops inquired, the guests should say that Seats and Wells had been at the party all evening.

During his time at the police station on the evening of August 24, where he ultimately confessed to the murder, Seats made the following statements among others:

> I let my emotions get the best of me. I let something that happened a month and a half ago take over my mind and make me do what I did. . . . At least I should've killed the right one; I wish that was Reuben [Ramirez] that was on my side of that couch.
>
> . . . .
>
> . . . Some people was telling me that after me and [Ramirez] got into that fight and stuff and he got injured real bad that the police was going to try to get me for attempted murder from beating him with a brick and all that and breaking his arms and messing up his back or whatever. And so that's what I was real scared about, like, I don't want to go to prison for no attempted murder over a fight. . . . I was hearing around town that, yeah, they was looking for me for trying to kill him . . . so I just said f*** it and just went over there.
>
> . . . .
>
> . . . [Ramirez] was laying, like, I don't know who was it, he was laying on the couch like this. . . . There was a closer couch and a farther couch and so me and Andre standing over him and I tapped him with the gun, like, "Get up." And then he was saying something and then, I don't know. . . . I'm actually in there in front of this man and facing him, I know I got to kill him now 'cause I'm already inside his house. . . . I just emptied the whole clip and walked out.

The agents asked how the victim reacted after Seats shot him and Seats said, "To tell you the truth, I just shot five times and turned my back and walked off."

By the time of trial a year later, Seats was eighteen years and seven months old. McFarland was one of the State's main witnesses, having entered into a plea agreement with the State. McFarland had agreed to plead guilty to aiding and abetting first-degree burglary and to testify at Seats's trial. *See* Iowa Code §§ 713.1, .3 (2009).[3]

During the defense case, Seats took the stand. Seats testified he had grown up in Chicago, Illinois, but moved to Charles City with his mother and oldest brother when he was twelve. After a year, he moved with his mother to Mason City. He lived there with his mother and sister for two years, attending the Mason City schools. During Seats's freshman year, his mother moved back to Chicago, but Seats accompanied her for less than a year, returning to Mason City where he attended school through the eleventh grade and played sports. Seats lived with his older brother in Mason City until the brother went to prison. After that, Seats had no regular home; in August 2008 he was "homeless" in his own words, with clothing scattered around several houses, although he often stayed at the house of his best friend, whose mother took care of him.

Seats also testified he had a good relationship with his own mother who was sending him money from Chicago every week. He had just begun to attend the alternative school in Mason City for twelfth grade at

---

[3]Wells subsequently entered into a plea agreement under which he pled guilty to involuntary manslaughter, *see* Iowa Code § 707.5, and first-degree robbery, *see id.* §§ 711.1–.2.

the time of the murder. Seats also claimed that he had been planning to start a part-time job the Monday after the shooting.

At trial, Seats recanted his earlier confession. He testified that a man several years older than him named Brandon Crawford had committed the murder. Seats claimed his girlfriend had recently told him she was pregnant. Seats, believing he was going to become a father, testified he was concerned about supporting a child and therefore contacted Crawford to ask if he (Seats) could sell drugs for Crawford to make money. According to Seats, on the night of the shooting, he planned to meet Crawford and pick up drugs. It so happened that the meeting was to occur near Ramirez's house.

Seats thus testified that McFarland was actually driving Seats and Wells so they could meet Crawford, not so they could enter Ramirez's house. Seats testified that when they stopped, Wells got the gun out of the trunk for protection, while Seats urged Wells to "leave the gun" because "[t]here's no reason for it." Thereafter, according to Seats, he entered Crawford's SUV. While inside Crawford's vehicle, Seats allegedly received a bag from Crawford. Seats testified that after he exited Crawford's vehicle and while he was walking back to McFarland's car, Crawford, Wells, and a third person who had been in Crawford's vehicle began to huddle together and have a conversation that Seats could not hear. Wells then supposedly asked for the shirt off Seats's back and proceeded to tie it on his head to cover his face. Seats allegedly continued to walk toward McFarland's car. Seats claimed he did not see where the other three went, but gunshots rang out a short while later. Upon hearing the shots, Seats claimed he ran the rest of the way to McFarland's car. Wells also allegedly reentered McFarland's car soon thereafter. Once they were both in McFarland's car, Wells reportedly

handed Seats the gun, wrapped in the t-shirt Seats had previously given him.

Seats denied ever entering Ramirez's house that evening. He admitted hiding the gun under the bushes. In short, Seats told a story consistent with much of McFarland's testimony that nonetheless would have exonerated him of the murder.

Seats went on to testify that the story he had told police during his initial afternoon interview was correct in that he had nothing to do with the shooting. Seats admitted lying during that interview about not being anywhere near the area when the shooting occurred. According to Seats, after he left the first interview, he ran into Crawford. Crawford supposedly slammed Seats to the ground and threatened to harm Seats's family if Seats did not lie to protect Crawford. Seats stated Crawford instructed him to tell the police that only Seats and Wells had been in the house and that one of them shot Ramirez. Seats testified he was scared of Crawford and that was the reason he falsely confessed to the murder during the evening interview. Seats explained he was able to draw a diagram of the murder scene during the second interview because he had previously seen the layout of the house during the night of the fight involving the brick.

The State called Crawford as a rebuttal witness. Crawford testified he was at home from approximately 11:30 p.m. onward on the night of August 23. He denied speaking to Seats on the night of August 23 and claimed he never met with Seats to deliver drugs to him near Ramirez's house. He also denied that he saw or threatened Seats on August 24. Crawford's girlfriend corroborated Crawford's testimony about his being at home on the night of the shooting.

A jury found Seats guilty of both first-degree murder and first-degree burglary. As statutorily required, he was sentenced to life without parole on the first-degree murder conviction.

Four years later, in November 2013, Seats received a resentencing based on the United Supreme Court decision in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), and our decisions in *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013), *State v. Null*, 836 N.W.2d 41 (Iowa 2013), and *State v. Pearson*, 836 N.W.2d 88 (Iowa 2013).

As pointed out by the majority, the PSI that was prepared for Seats's resentencing covered not only the first eighteen years of Seats's life but also the subsequent four years he had spent in prison. Thus, the PSI noted Seats's difficult childhood, including a lack of adult supervision and an early exposure to gang violence. It also reported Seats had an extensive juvenile criminal history, including assault, going armed with a knife, possession of a controlled substance, and third-degree burglary. And it noted Seats—while imprisoned—had been disciplined ten times. Seats had dropped out of a GED program and was not permitted to hold a job in prison because of his disciplinary status. The majority raises no question about the comprehensiveness of the PSI.

The State presented one witness at the resentencing hearing—a relative of the victim. She testified that Cervantes's fiancée had been pregnant in Mexico with Cervantes's child at the time of the murder and was now raising the child in an impoverished area of Mexico.

Seats, now almost twenty-three years old, also testified at the hearing. His direct testimony, covered in great detail by the majority, described the very serious challenges Seats had to confront while growing up. The State cross-examined Seats only briefly, ending with the following exchange:

Q. Now in the pre-sentence investigation, they asked you about what happened in the incident of this crime and you denied any involvement in it. Is that fair? A. I didn't deny any involvement. I denied that I killed the man.

Q. Okay. And you continue to deny that today; is that right? A. Absolutely, because it didn't happen.

As the quotations recited in the majority opinion indicate, the district court clearly understood its role in resentencing Seats. In particular, its job was to follow *Miller, Ragland, Null,* and *Pearson.* This meant, as the court put it, that it "must take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (Internal quotation marks omitted.) The court said on the record that this was one of the "unusual" cases in which life without parole was warranted, and then explained why. The court specifically acknowledged Seats's troubled youth, but explained that other circumstances carried greater weight. Although the majority has quoted from the district court's explanations and reasoning, the following statement also bears quotation:

As to the crime, Mr. Seats shot a man asleep on a couch. Mr. Seats was not provoked, it was not a situation of a conflict that got out of control, and there is no arguable issue of self-defense. Mr. Seats was a primary actor in the murder and not a bystander who got caught up in events. He then took a series of proactive communications after his arrest, and he was demonstrably able to assist in his own defense at trial. Mr. Seats still does not acknowledge his guilt, show remorse for the crime he committed or demonstrate concern for the victim or the victim's family.

I will now address Seats's argument that the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution *categorically* prohibit the sentence of life without parole for persons who commit first-degree murder when under the age of

eighteen.[4]  I will then turn to Seats's alternative, as-applied challenge to his life-without-parole sentence.[5]

**II. Seats's Categorical Challenge to Life-Without-Parole Sentences for Juveniles Convicted of First-Degree Murder.**

**A. Recent United States Supreme Court Precedent.**  In *Roper v. Simmons*, 543 U.S. 551, 575, 125 S. Ct. 1183, 1198, 161 L. Ed. 2d 1, 25, (2005), the United States Supreme Court held that the Eighth Amendment categorically prohibits the execution of juveniles who commit murder.  "[T]he death penalty is disproportionate punishment for offenders under 18," the Court stated.  *Id.*

The *Roper* Court initially noted a "national consensus against the death penalty for juveniles"—marked by "the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice."  *Id.* at 564, 567, 125 S. Ct. at 1192, 1194, 161 L. Ed. 2d at 18, 20.  Also, the Court found that due to differences between juveniles and adults, "juvenile offenders cannot with reliability be classified among the worst offenders."  *Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21.  "[A] greater possibility exists that a minor's character deficiencies will be reformed."  *Id.* at 570, 125 S. Ct. at 1195–

---

[4]The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  Article I, section 17 states, "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted."  Iowa Const. art. I, § 17.

[5]The majority states that Seats has raised three issues on appeal.  Technically that is true, but the second issue is simply a brief recapitulation of the argument we have already accepted in *Ragland*, 836 N.W.2d at 122, namely, that even with the benefit of the Governor's commutation from life without parole to sixty years before eligibility for parole, Seats has the functional equivalent of an LWOP sentence.  The only arguments that present previously unresolved issues are Seats's categorical and his as-applied challenges to his LWOP sentence.

96, 161 L. Ed. 2d at 22. Furthermore, the *Roper* Court observed that juveniles, on the whole, have "diminished culpability," and therefore "the penological justifications for the death penalty apply to them with lesser force than to adults." *Id.* at 571, 125 S. Ct. at 1196, 161 L. Ed. 2d at 23. "Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.*

Five years later, in *Graham v. Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 2034, 176 L. Ed. 2d 825, 850 (2010), the Supreme Court held the Eighth Amendment categorically prohibits a juvenile offender from being sentenced to life without parole for a nonhomicide crime. The Court relied on several considerations.

First, it noted that this sentencing practice is "exceedingly rare." *Id.* at 67, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841. "[O]nly 11 jurisdictions nationwide in fact impose life without parole sentences on juvenile nonhomicide offenders—and most of these do so quite rarely . . . ." *Id.* at 64, 130 S. Ct. at 2024, 176 L. Ed. 2d at 839.

Second, the *Graham* Court considered culpability and severity. It observed that persons, especially juveniles, "who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 69, 130 S. Ct. at 2027, 176 L. Ed. 2d at 842.

> It follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis.

*Id.* The Court emphasized that LWOP is "the second most severe penalty permitted by law." *Id.* (internal quotation marks omitted).

After discussing the penological justifications, the *Graham* Court held the Eighth Amendment requires states to give all juvenile nonhomicide offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 846.

In *Miller*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2467, 183 L. Ed. 2d 407, 422 (2012), the Supreme Court confronted the constitutionality of LWOP sentences for juvenile offenders convicted of murder.  It found that a *mandatory* life-without-parole sentence was unconstitutional because the Eighth Amendment required individualized sentencing accounting for the offender's youth.  *Id.*  As the Court put it,

> Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one.

*Id.* at ___, 132 S. Ct. at 2467–68, 183 L. Ed. 2d at 422.  The *Miller* holding thus had two components.  First, a mandatory—as opposed to a discretionary—LWOP sentence for a juvenile murderer is impermissible. Second, in exercising the required discretion, the sentencing authority has to consider the offender's youth and matters relevant to that youth.

Although the *Miller* Court did not foreclose an LWOP sentence for a juvenile who commits murder, it did state as follows:

> [G]iven all we have said . . . about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.  That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.  Although we do not

> foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 (citation omitted) (internal quotation marks omitted).

In short, *Miller* left open LWOP as a potential sentencing option. Still, it did establish that no juvenile could be sentenced to LWOP unless the sentencing court first conducted a hearing that considered the characteristics of youth and their mitigating effects. And it indicated that appropriate occasions for such sentences would be uncommon. As the Court stated later in the opinion, "[A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at ___, 132 S. Ct. at 2475, 183 L. Ed. 2d at 430. The *Miller* Court condemned mandatory sentencing laws because they "prohibit a sentencing authority from assessing *whether* the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at ___, 132 S. Ct. at 2466, 183 L. Ed. 2d at 420–21 (emphasis added).

**B. Our Recent Precedent.** In the wake of *Miller*, we have decided several cases on juvenile sentencing. *See generally* Elisabeth A. Archer, Note, *Establishing Principled Interpretation Standards in Iowa's Cruel and Unusual Punishment Jurisprudence*, 100 Iowa L. Rev. 323, 337–44 (2014) (discussing the Iowa Supreme Court's recent caselaw under article I, section 17 of the Iowa Constitution). Two years ago, in *Ragland*, 836 N.W.2d at 122, we held the Governor's blanket commutation of LWOP sentences to life without parole for sixty years resulted in sentencing that did not comply with *Miller*. We said, "[T]he unconstitutional imposition of a mandatory life-without-parole sentence is not fixed by substituting it

with a sentence with parole that is the practical equivalent of a life sentence without parole." *Id.* at 121. We also summarized five factors that a court must consider at the individualized hearing required by *Miller*:

> In *Miller*, the Court described the factors that the sentencing court must consider at the hearing, including: (1) the "chronological age" of the youth and the features of youth, including "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the "family and home environment" that surrounded the youth; (3) "the circumstances of the homicide offense, including the extent of [the youth's] participation in the conduct and the way familial and peer pressures may have affected [the youth]"; (4) the "incompetencies associated with youth—for example, [the youth's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the youth's] incapacity to assist [the youth's] own attorneys"; and (5) "the possibility of rehabilitation."

*Id.* at 115 n.6 (alterations in original) (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423).

At the same time, in *State v. Null*, 836 N.W.2d at 76, we held under the Iowa Constitution that the *Miller* ruling applies to a mandatory sentence of 52.5 years before parole eligibility. We stated that before imposing this kind of sentence, the trial court must (1) "recognize that because children are constitutionally different from adults, they ordinarily cannot be held to the same standard of culpability as adults in criminal sentencing"; (2) make findings to justify an exception to this general rule; (3) "recognize that [j]uveniles are more capable of change than are adults" and "most juveniles who engage in criminal activity are not destined to become lifelong criminals"; and (4) "recognize that a lengthy prison sentence without the possibility of parole . . . is appropriate, if at all, only in rare or uncommon cases." *Id.* at 74–75 (alteration in original) (internal quotation marks omitted).

Also on the same day, in *State v. Pearson*, 836 N.W.2d at 96–97, we held under the Iowa Constitution that *Miller* applies to a sentence of thirty-five years before parole eligibility, comprised of two consecutive mandatory periods of incarceration. We condemned as insufficient a sentencing hearing that "emphasized the nature of the crimes to the exclusion of the mitigating features of youth, which are required to be considered under *Miller* and *Null*." *Id.* at 97. We therefore vacated Pearson's sentence and remanded for "application of the *Miller* standards as described in *Null* and this opinion." *Id.*

Finally, last year, in *State v. Lyle*, 854 N.W.2d 378, 400 (Iowa 2014), we found all mandatory minimum prison sentences for juveniles unconstitutional under article I, section 17. We concluded that "the sentencing of juveniles according to statutorily required mandatory minimums does not adequately serve the legitimate penological objectives in light of the child's categorically diminished culpability." *Id.* at 398. We said that "juveniles can still be sentenced to long terms of imprisonment, but not mandatorily." *Id.* at 401. However, we reserved and did not decide the question whether an LWOP sentence could be imposed on any juvenile who commits murder. *Id.* n.7. That question was not before us in *Lyle*, but is before us today, although the majority declines to decide it.

**C. Recent Legislative Action in Iowa and Elsewhere.** Following *Graham*, our general assembly eliminated life without parole as a possible sentence for class "A" felonies committed by juveniles other than first-degree murder. *See* 2011 Iowa Acts ch. 131, § 147 (codified at Iowa Code § 902.1(2) (2013)). Additionally, during the 2015 legislative session, the general assembly enacted a law that provides three alternatives for juveniles convicted of first-degree murder:

[A] defendant convicted of murder in the first degree in violation of section 707.2, and who was under the age of eighteen at the time the offense was committed shall receive one the following sentences:

     (1)  Commitment to the director of the department of corrections for the rest of the defendant's life with no possibility of parole unless the governor commutes the sentence to a term of years.

     (2)  Commitment to the custody of the director of the department of corrections for the rest of the defendant's life with the possibility of parole after serving a minimum term of confinement as determined by the court.

     (3)  Commitment to the custody of the director of the department of corrections for the rest of the defendant's life with the possibility of parole.

2015 Iowa Legis. Serv. no. 76 (S.F. 448) (West 2015) (to be codified at Iowa Code § 902.1).

This law by its terms applies to "a person who was convicted of a class 'A' felony prior to, on, or after the effective date of this Act and who was under the age of eighteen at the time the offense was committed." *Id.* § 5. It passed the senate by a vote of forty-seven to three, passed the house by a vote of eighty to eighteen, and was signed by the Governor on April 24, 2015. S. Journal, 86th G.A., 1st Reg. Sess., at 626, 932 (Iowa 2015); H. Journal 86th G.A., 1st Reg. Sess., at 803–04 (Iowa 2015). Thus, the Iowa legislature has decided to provide sentencing discretion to the district courts in juvenile homicide cases, as required by *Miller*, while retaining life without parole as a sentencing option.

In contrast to Iowa, six state legislatures and the District of Columbia have responded to *Miller* by eliminating LWOP for juveniles convicted of first-degree murder.[6] These states join six jurisdictions that

---

[6]*See* D.C. Code § 22-2104 (West, Westlaw through June 1, 2015) ("[N]o person who was less than 18 years of age at the time the murder was committed shall be sentenced to life imprisonment without release.); Haw. Rev. Stat. § 706-656(1) (West, Westlaw through June 3, 2015) ("Persons under the age of eighteen years at the time of

already prohibited life without parole for juveniles prior to the *Miller* decision.[7]

However, a total of twenty-four jurisdictions in addition to Iowa have retained life without parole as a sentencing option for juveniles who commit murder following *Miller*.[8]

_____

the offense who are convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment with the possibility of parole."); Tex. Penal Code Ann. § 12.31(a) (West, Westlaw through 84th Legis., ch. 46 of 2015 Reg. Sess.) (stating only individuals eighteen years of age and older can be sentenced to life imprisonment without parole for capital felonies); Vt. Stat. Ann. tit. 13, § 7045 (West, Westlaw through No. 22 of 1st Sess. of 2015–2016 Gen. Assemb.) ("A court shall not sentence a person to life imprisonment without the possibility of parole if the person was under 18 years of age at the time of the commission of the offense."); W. Va. Code Ann. § 61-11-23(a)(2) (West, Westlaw through 2015 Reg. Sess.) (banning life-without-parole sentences for persons under eighteen years of age who were convicted of an offense punishable by life imprisonment); Wyo. Stat. Ann. § 6-10-301(b) (West, Westlaw through 2014 Budget Sess.) (prohibiting life-without-parole sentences for persons under eighteen years of age at the time of the offense, unless they have assaulted an officer or attempted to escape since being incarcerated and reaching the age of majority); 2015 Nev. Stat. ch. 152, § 2 (to be codified at Nev. Rev. Stat. § 176.025) ("A sentence of death or life imprisonment without the possibility of parole must not be imposed or inflicted upon any person convicted of a crime . . . who at the time of the commission of the crime was less than 18 years of age.").

[7]*See* Alaska Stat. Ann. § 12.55.125(a) (West, Westlaw current 2015 1st Reg. Sess. of 29th Leg.) (applying term of years sentences in place of life sentences); Colo. Rev. Stat. Ann. § 18-1.3-401(4)(b)(I) (West, Westlaw current through May 15, 2015 of 1st Reg. Sess. of 70th Gen. Assemb.); Kan. Stat. Ann. § 21-6618 (West, Westlaw through 2014 Reg. and Spec. Sess.); Mont. Code Ann. § 46-18-222 (West, Westlaw through chapters effective Feb. 27, 2015, 2015 Sess.); N.M. Stat. Ann. §§ 31-21-10, 31-18-15.3 (West, Westlaw through 2014 Legis., and including chapters 5, 75, 79, 83, 88, 99, 136, 149, and 150 of 1st Reg. Sess. of 52d Leg. (2015)), Or. Rev. Stat. Ann. § 161.620 (West, Westlaw through chapter 275 of 2015 Reg. Sess.). Kentucky banned life without parole for juveniles under the age of sixteen. *See* Ky. Rev. Stat. Ann. § 640.040 (West, Westlaw through immediately effective legis. from 2015 Reg. Sess.).

[8]*See* Ariz. Rev. Stat. Ann. § 13-751(A)(2) (West, Westlaw through legis. effective Apr. 13, 2015 of 1st Reg. Sess. of 52d Leg.) (retaining the option of life without parole for juveniles convicted of first-degree murder); Ark. Code Ann. § 5-4-104(b) (West, Westlaw 2015 Reg. Sess. laws effective through Apr. 8, 90th Ark. Gen. Assemb.) (allowing the option of life imprisonment without parole for defendants convicted of capital murder or treason while younger than eighteen years of age); Cal. Penal Code § 190.5 (West, Westlaw through urgency legis. through chapter 4 of 2015 Reg. Sess.) (permitting life without parole for juveniles between sixteen and eighteen years of age at the discretion of the court); Del. Code. Ann. tit. 11, § 4209A (West, Westlaw through 80 Laws 2015, chapter 29) (permitting life without parole for juveniles convicted of first-degree murder and imposing a twenty-five year minimum prison term); Fla. Stat. Ann. § 775.082 (West, Westlaw through chapters from 2015 1st Reg. Sess. of 24th Leg. in

effect through June 2, 2015) (stating a juvenile can be sentenced to life imprisonment if a judge determines it is the appropriate sentence); Ga. Code Ann. § 16-5-1 (West, Westlaw through Acts 2 through 44, 200, 203, 207, 209, 211, 217, 225, 229, 236, 249, 252, 300, 304, 306, and 309 of 2015 Sess. of Ga. Gen. Assemb.) (allowing LWOP as an option for persons convicted of murder); Idaho Code Ann. § 18-4004 (West, Westlaw through chapter 212 of 2015 1st Reg. Sess. of 63d Idaho Leg.) (stating that the punishment for murder where the death penalty is not sought shall be life with no parole eligibility for at least ten years); Ind. Code Ann. § 35-50-2-3 (West, Westlaw through 2015 1st Reg. Sess. of 119th Gen. Assemb. legis. effective through June 28, 2015) (allowing discretionary life without parole for persons between sixteen and eighteen years of age); La. Rev. Stat. Ann. § 15:574.4(E) (West, Westlaw through 2014 Reg. Sess.) (allowing juvenile life without parole for first- and second-degree murder); Me. Rev. Stat. Ann. tit. 17-A, § 1251 (West, Westlaw through emergency legis. through chapter 96 of 2015 1st Reg. Sess. of 127th Leg.) (allowing either life imprisonment or a term of years sentence for murder); Md. Code Ann., Crim. Law § 2-201 (West, Westlaw through June 1, 2015 legis. of 2015 Reg. Sess. of Gen. Assemb.) (setting the penalty for first-degree murder as life imprisonment with or without parole); Mich. Comp. Laws Ann. § 769.25 (West, Westlaw through P.A. 2015, No. 43, of 2015 Reg. Sess., 98th Leg.) (permitting the prosecuting attorney to seek a sentence of imprisonment for life without the possibility of parole and imposing a twenty-five year minimum term for juveniles not sentenced to life); Neb. Rev. Stat. Ann. § 28-105.02 (West, Westlaw through end of 2014 Reg. Sess.) (stating a person under eighteen years convicted of a Class 1A felony shall be sentenced to between forty years' and life imprisonment and allowing the defendant to submit mitigating factors to the court at sentencing); N.Y. Penal Law § 70.00 (McKinney, Westlaw through L. 2015, chapters 1 to 18, 50 to 61) (allowing life imprisonment without parole for persons convicted of class A felonies); N.C. Gen. Stat. Ann. § 15A-1340.19A–B (West, Westlaw through chapter 38 of 2015 Reg. Sess. of Gen. Assemb.) (allowing a possible life-without-parole sentence for juveniles convicted of first-degree murder and imposing a twenty-five year minimum sentence for juveniles eligible for parole); N.D. Cent. Code Ann. § 12.1-32-01 (West, Westlaw through HB 1104, HB 1105, HB 1107, HB 1127, HB 1134, HB 1159, HB 1199, HB 1206, HB 1281, HB 1358, HB 1370, HB 1390, HB 1407, SB 2052, SB 2079, SB 2082, SB 2100, SB 2176, SB 2188, SB 2237, SB 2271 and SB 2301 of 2015 Reg. Sess. of 64th Leg.) (setting the maximum penalty for class AA felonies as life without parole); Okla. Stat. Ann. tit. 21, § 701.9 (West, Westlaw through emergency effective provisions through chapter 338 of 1st Reg. Sess. of 55th Leg. (2015)) (allowing life-without-parole sentences for first-degree murder); 18 Pa. Cons. Stat. Ann. § 1102.1 (West, Westlaw through Act 2015-4) (stating a court has discretion to sentence a juvenile to life without parole and imposing minimum sentences for juveniles sentenced to terms of imprisonment rather than life); R.I. Gen. Laws Ann. § 11-23-2 (West, Westlaw through chapter 41 of Jan. 2015 Sess.) (allowing the court to impose life-without-parole sentences for persons convicted of murder in the first degree); S.D. Codified Laws § 22-6-1 (West, Westlaw current through 2014 Reg. Sess.) ("If the defendant is under the age of eighteen years at the time of the offense and found guilty of a Class A or B felony, the maximum sentence may be life imprisonment in the state penitentiary."); Tenn. Code Ann. § 39-13-202 (West, Westlaw through laws from 2015 1st Reg. Sess., effective through Apr. 6. 2015) (allowing discretionary life without parole for first-degree murder); Utah Code Ann. § 76-3-207.7 (West, Westlaw through 2014 Gen. Sess.) (allowing a life-without-parole sentence for juveniles convicted of aggravated murder); Wash. Rev. Code Ann.

Lastly, eleven states that had statutory schemes imposing mandatory life without parole on certain juvenile homicide offenders have yet to pass new legislation conforming their respective statutory schemes to *Miller*.[9]

**D. Does the Eighth Amendment Categorically Prohibit Life Without Parole for Juveniles Who Commit Murder?** To my knowledge, no appellate court has determined that the Eighth Amendment, in light of *Miller*, categorically prohibits LWOP sentences for juvenile homicide offenders. To the contrary, numerous appellate courts have affirmed LWOP sentences for juvenile murderers post-*Miller*.[10] *Miller* itself said,

---

§ 10.95.030(3) (West, Westlaw through legis. effective through May 18, 2015) (stating that juveniles can be sentenced to life without parole but the court must take into account mitigating factors before handing down a life sentence); Wis. Stat. Ann. § 939.50 (West, Westlaw through 2015 Act 20) (setting life imprisonment as the penalty for Class A felonies).

[9]*See* Ala. Code § 13A-5-45 (West, Westlaw through Act 2015-183 of 2015 Reg. Sess.); Conn. Gen. Stat. Ann. § 54-125a (West, Westlaw through Pub. Acts 15-3 through 15-5 of 2015 Jan. Reg. Sess. of Conn. Gen. Assemb.); 730 Ill. Comp. Stat. Ann. 5/5-8-1 (West, Westlaw through P.A. 99-4 of 2015 Reg. Sess.); Minn. Stat. Ann. § 609.106 (West, Westlaw through chapters 1 to 15, 24, 43, 45, 46, 49, 51, and 53 of 2015 Reg. Sess.); Miss. Code. Ann. § 47-7-3 (West, Westlaw through laws in effect through Apr. 23, 2015); Mo. Ann. Stat. § 565.020 (West, Westlaw through emergency legislation approved through Apr. 8, 2015, of 2015 1st Reg. Sess. of 98th Gen. Assemb.); N.H. Rev. Stat. Ann. § 630:1-a (West, Westlaw through chapter 48 of 2015 Reg. Sess.); N.J. Stat. Ann. § 2C:11-3 (West, Westlaw through L. 2015, c. 60 and J.R. No. 1); Ohio Rev. Code Ann. § 2929.03 (West, Westlaw through 2015 Files 1 to 6 of the 131st Gen. Assemb.); S.C. Code Ann. § 17-25-45 (West, Westlaw through Acts 1 and 3 of 2015 Sess.); Va. Code Ann. § 18.2-10 (West, Westlaw through end of 2014 Reg. Sess. and end of 2014 Sp. S.I. and includes 2015 Reg. Sess. cc. 1, 7, 8, 39, 61, 67, and 89).

[10]*See Evans–García v. United States*, 744 F.3d 235, 240 (1st Cir. 2014) (finding a habeas petitioner not entitled to relief because he received a discretionary life-without-parole sentence); *Pennington v. Hobbs*, 451 S.W.3d 199, 202 (Ark. 2014) (holding that a nonmandatory sentence of life without parole did not violate *Miller*); *People v. Wilder*, ___ P.3d ___, ___, 2015 WL 795834, at *5 (Colo. App. Feb. 26, 2015) ("*Miller* did not categorically bar the imposition of a life without parole sentence for a juvenile offender."); *People v. Gutierrez–Ruiz*, ___ P.3d ___, ___, 2014 WL 4242887, at *4 (Colo. App. Aug. 28, 2014) ("[T]he constitutional defect in defendant's sentence for first degree murder is not its length or the fact that he will not be eligible for parole. Instead,

Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham.* Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty.

567 U.S. at ___, 132 S. Ct. at 2471, 183 L. Ed. 2d at 426.

I would read *Miller* as every other appellate court has. *Miller* allows states to impose LWOP sentences on some juveniles who commit murder

_____

defendant's sentence of life without parole violates the Eighth Amendment because it was imposed without any opportunity for the sentencing court to consider whether this punishment is just and appropriate in light of defendant's age, maturity, and the other factors discussed in *Miller*."); *Washington v. State*, 103 So. 3d 917, 920 (Fla. Dist. Ct. App. 2012) ("Under *Miller*, a sentence of life without the possibility of parole remains a constitutionally permissible sentencing option."); *Foster v. State*, 754 S.E.2d 33, 37 (Ga. 2014) (finding no Eighth Amendment violation in a discretionary life-without-parole sentence); *People v. Baker*, 28 N.E.3d 836, 848 (Ill. App. Ct. 2015) ("Under *Miller*, a juvenile defendant can be sentenced to natural life in prison without parole, so long as the natural life sentence is at the trial court's discretion and not mandatory."); *Conley v. State*, 972 N.E.2d 864, 879 (Ind. 2012) ("Our holding that [Indiana's discretionary] life-without-parole sentence is not unconstitutional is not altered by *Miller*."); *State v. Fletcher*, 149 So. 3d 934, 941 (La. Ct. App. 2014) ("*Miller* did not preclude life without parole for juveniles. It merely required that a sentencing court consider mitigating facts related to the juvenile's youth before imposing a sentence without benefit of parole."); *People v. Carp*, 852 N.W.2d 801, 841 (Mich. 2014), *petitions for cert. filed sub nom. Carp v. Michigan* (U.S. Jan. 13, 2015) (No. 14-824), *Davis v. Michigan* (U.S. Jan. 23, 2015) (No. 14-8106) ("[T]he proportionality review employed by the United States Supreme Court in fashioning the rules in *Roper*, *Graham*, and *Miller* . . . does not support the categorical rule sought by defendants."); *State v. Ali*, 855 N.W.2d 235, 258 (Minn. 2014) ("The Court specifically did not foreclose the punishment of [LWOP] for juveniles, but required that such sentences not be imposed without taking the defendants' youth into consideration."); *State v. Hart*, 404 S.W.3d 232, 238 (Mo. 2013) ("From these forceful and repetitious statements, it is reasonable to infer that the Supreme Court did not intend for *Miller* to be misused in precisely the way that Hart suggests, i.e., that the Supreme Court was not holding that the Eighth Amendment categorically prohibits life sentences without parole for juvenile offenders found guilty of first-degree murder."); *Commonwealth v. Batts*, 66 A.3d 286, 296 (Pa. 2013) ("*Miller* requires only that there be judicial consideration of the appropriate age-related factors set forth in that decision prior to the imposition of a sentence of life imprisonment without the possibility of parole on a juvenile."); *Aiken v. Byars*, 765 S.E.2d 572, 578 (S.C. 2014) ("Without question, the judge may still determine that life without parole is the appropriate sentence in some of these cases in light of other aggravating circumstances."); *State v. Houston*, ___ P.3d ___, ___, 2015 WL 773718, at *14 (Utah Mar. 13, 2015) ("[W]e conclude that imposing LWOP on a juvenile convicted of homicide does not violate the Eighth Amendment's prohibition on cruel and unusual punishments.").

without violating the Eighth Amendment. Seats would invert the foregoing quotation from *Miller* (i.e., "does not categorically bar"). He asks us to hold that *Miller does categorically bar* a penalty for a class of offenders or type of crime. That is not what *Miller* says.

**E. Does Article I, Section 17 of the Iowa Constitution Categorically Prohibit Life-Without-Parole Sentences for Juveniles Who Commit Murder?** In considering Seats's categorical challenge under the Iowa Constitution, I believe it is valuable to draw on two additional sources of authority—pre-2013 Iowa caselaw and decisions from other states addressing categorical challenges to juvenile homicide LWOP sentences under their state constitutions. After examining these authorities, I turn to the question whether the Iowa Constitution prohibits all LWOP sentences for juvenile murderers.

1. *Additional Iowa caselaw.* This court has been dealing with the difficult questions raised by both juvenile sentencing and LWOP sentences for some time. That effort did not begin with the *Ragland/Null/Pearson* trilogy in 2013.

Thus, our court has held that a mandatory LWOP sentence for an adult who commits first-degree kidnapping does not violate article I, section 17. *See State v. Nims*, 357 N.W.2d 608, 610–11 (Iowa 1984). We have also upheld against state constitutional challenge a mandatory sentence of 42.5 years' imprisonment before parole eligibility for an adult who commits second-degree murder. *See State v. Cronkhite*, 613 N.W.2d 664, 669–70 (Iowa 2000).

More recently, we held an LWOP sentence for an adult who committed third-degree sexual abuse for the second time did not violate article I, section 17. *See State v. Oliver*, 812 N.W.2d 636, 649–53 (Iowa 2012). As a twenty-four-year-old, the defendant had sexual relations

with a girl who was fourteen or fifteen, and later as a thirty-three-year-old, he had sexual relations with a girl who was thirteen. *Id.* at 651. We concluded that no inference of gross disproportionality arose and ended the analysis there. *Id.* at 653.

We have also said, "We seek to interpret our constitution consistent with the object sought to be obtained at the time of adoption as disclosed by the circumstances." *Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845, 851 (Iowa 2014); *see also Homan v. Branstad*, 812 N.W.2d 623, 629 (Iowa 2012) (indicating that in construing a provision of the Iowa Constitution, "our mission 'is to ascertain the intent of the framers.'" (quoting *Rants v. Vilsack*, 684 N.W.2d 193, 199 (Iowa 2004))). Yet when our present constitution was adopted, our laws mandated capital punishment for first-degree murder. *See* Iowa Code § 2569 (1851). During that time period, juveniles over fourteen were presumed to have the capacity to commit criminal acts, and when tried, were tried as adults. *See Lyle*, 854 N.W.2d at 390.

In an early case, decided when our constitution was of relatively recent vintage, we upheld the conviction and death sentence of juvenile James Dooley for the murder of his aunt and cousin. *See State v. Dooley*, 89 Iowa 584, 594, 57 N.W. 414, 417 (1894). Dooley was sixteen when he committed his crimes, and at the time, our laws authorized the jury to determine either death or imprisonment for life at hard labor as the punishment for first-degree murder. *Id.* at 586–87, 57 N.W. at 415. The jury chose death. *Id.* at 594, 57 N.W. at 417. We described the facts of the case and also made a number of observations concerning the defendant:

> There can be no reasonable doubt that defendant is guilty of the crime of which he was convicted. He commenced to work for his uncle in September, 1891, and

worked for him continuously until the time of the murder, excepting some time during the winter, when he attended the Prescott school. In the morning of May 11, after his uncle left home, his aunt scolded him for permitting the cattle to get into a neighbor's field, which made him angry. At about 10 o'clock he went to Prescott, and while there wrote an order on a merchant of the town, to which he signed a name intended to be that of his uncle, and with it went to a hardware store, where he inquired for revolvers. He was shown one, which he agreed to take, if the merchant would accept the order. The order was accepted, and the defendant carried away with him the revolver and a box of cartridges. He states that he purchased the revolver to practice with, and at the time had no intention of shooting any one; that he had half a pint of whisky with him, which he and another person drank, and that he went home about noon; that his aunt was usually kind to him; and that he had not felt any improper desires towards her or his cousin, but when he reached home the cattle were in a neighbor's field. Mrs. Coons scolded him at the dinner table for neglecting the cattle, and they quarreled for some minutes. After dinner, about half past 12 o'clock, she again began scolding him. He had in his pocket a padlock, which he had picked up in the yard for the purpose of unlocking it, but when Mrs. Coons scolded him he became angry, and struck her on the head twice with it. The blows knocked her down. They struggled for a time, and he then shot her. The little girl came running in from the barn, and as she came through the door he struck her on the head with the padlock, and knocked her down; then shot her in the forehead. He placed the bodies on the bed, took a satchel, with clothing, locked the house, harnessed the team to a buggy, and drove away. He further says that he did not recover from his passion sufficiently to realize the enormity of what he had done until he had driven four or five miles. . . . Counsel for appellant discuss at some length the character of the defendant, as shown by his history. His father died when he was but a few years old. His mother remarried, and he left home when he was about thirteen years of age, and worked at different places until he commenced working for his uncle. He seems to have been a quiet, well behaved boy, who was favorably regarded by those who knew him. He attended school in Prescott a portion of the winter preceding the murder, and during that winter joined a church, and attended Sunday school. He was not an apt pupil, and his mental development, from lack of opportunity or of natural ability, seemed to be a little inferior to the average development of boys of his age. He is described as having the appearance of an easy going, sluggish fellow, who did not have the perseverance boys of his age and opportunities usually have. He had not drank much intoxicating liquor, but was quite a reader of cheap,

sensational novels. . . . There is nothing in the record, excepting the commission of the crimes which were proven, to show that defendant is of a depraved nature. Certainly, he cannot be regarded as a hardened criminal, although guilty of a crime having few parallels in wanton atrocity in the history of the state. In view of the youth of the defendant, his lack of mental development, and his almost uniformly good conduct before the crime was committed, we should have been better satisfied had the jury designated imprisonment in the penitentiary for life as his punishment; but, in a legal sense, the evidence was sufficient to authorize the punishment designated, and there is no sufficient ground upon which we can prevent it.

*Id.* at 591–94, 57 N.W. at 416–17. Dooley was seventeen years old when we affirmed his conviction and sentence and was executed on the grounds of the Iowa State Penitentiary later the same year after he had turned eighteen. *See* N.N. Jones, *Biennial Report of the Warden of the Penitentiary at Fort Madison to the Governor of Iowa* 40–41 (1895).

Of course, originalism is not the only available tool in constitutional interpretation. *See, e.g.*, *Lyle*, 854 N.W.2d at 384 (referring to "evolving standards of decency" (internal quotation marks omitted)); *Chiodo*, 846 N.W.2d at 854 (same). In this area of law in particular, this court has said that "punishments once thought just and constitutional may later come to be seen as fundamentally repugnant to the core values contained in our State and Federal Constitutions as we grow in our understanding over time." *Lyle*, 854 N.W.2d at 385. My point here is simply that originalism would not support a categorical ban on the death penalty for juveniles who commit murder, let alone a ban on life without parole.

Additionally, we have long recognized that discretion in sentencing can alleviate possible constitutional problems under article I, section 17. In *State v. Teeters*, 97 Iowa 458, 462–63, 66 N.W. 754, 756 (1896), we rejected a constitutional challenge to a law permitting a sentence of up to

five years in prison or up to a $500 fine for obstructing a public highway, emphasizing that this was simply a maximum. As we put it, "If the law fixed arbitrarily the excessive punishment, the claim of the law being unconstitutional because of it would be more tenable." *Id.* at 463, 66 N.W. at 756.

2. *State constitutional rulings in other jurisdictions.* In the aftermath of *Miller*, a number of state appellate courts have addressed under their respective *state* constitutions categorical challenges to life-without-parole sentences for juvenile murderers. In all but one instance, they have overruled those challenges. *See, e.g., People v. Palafox*, 179 Cal. Rptr. 3d 789, 805 (Ct. App. 2014) (disagreeing with the proposition that "an LWOP term cannot properly be imposed *under California law* or the Eighth Amendment" (emphasis added)); *Bun v. State*, 769 S.E.2d 381, 383–84 (Ga. 2015) (rejecting the defendant's argument that imposition of an LWOP sentence violated the Georgia Constitution); *State v. Fletcher*, 149 So. 3d 934, 944, 950 (La. Ct. App. 2014) (rejecting a claim that the district court's imposition of a life-without-parole sentence following a post-*Miller* resentencing violated the Louisiana Constitution); *State v. Ali*, 855 N.W.2d 235, 258–59 (Minn. 2014) (rejecting the argument that the discretionary imposition of consecutive life sentences that are the practical equivalent of life without parole violated the Minnesota Constitution); *State v. Houston*, ___ P.3d ___, ___, 2015 WL 773718, at *14–15 (Utah Mar. 13, 2015) (rejecting the argument that LWOP is a categorically impermissible sentence under the Utah Constitution for a juvenile convicted of murder and noting that "a majority of our sister states as well as the federal system permit LWOP for juveniles convicted of the most heinous crimes").

In one case, the Michigan Supreme Court took note that Michigan's constitution, unlike the United States Constitution and the Iowa Constitution, contains disjunctive wording and prohibits punishments that are either "cruel *or* unusual." *People v. Carp*, 852 N.W.2d 801, 844 (Mich. 2014) (emphasis in original) (internal quotation marks omitted), *petitions for cert. filed sub nom. Carp v. Michigan* (U.S. Jan. 13, 2015) (No. 14-824), *Davis v. Michigan* (U.S. Jan. 23, 2015) (No. 14-8106). The court went on,

> The textual difference between the federal constitutional protection and the state constitutional protection is of consequence and has led this Court to conclude that Article 1, § 16 [of the Michigan Constitution] provides greater protection against certain punishments than its federal counterpart in that if a punishment must be both "cruel" *and* "unusual" for it to be proscribed by the Eighth Amendment, a punishment that is unusual but not necessarily cruel is also proscribed by Article 1, § 16.

*Id.* (emphasis in original) (internal quotation marks omitted). Yet despite this textual difference, the court was unwilling to conclude that LWOP was so disproportionate a punishment for a juvenile homicide offender as to be unconstitutional in all cases. *Id.* at 845–46.

In another case, the Pennsylvania Supreme Court similarly denied a categorical challenge to an LWOP sentence for a juvenile homicide offender, even though Pennsylvania's constitutional language differs from the Eighth Amendment. *See Commonwealth v. Batts*, 66 A.3d 286, 299 (Pa. 2013). The Pennsylvania Constitution prohibits "cruel punishment"—whether unusual or not. *Id.* at 298 (internal quotation marks omitted). Nonetheless, the *Batts* court concluded,

> We find the textual analysis provided by Appellant and his *amici* to carry little force. The purport of the argument is that this Court should expand upon the United States Supreme Court's proportionality approach, not that it should

derive new theoretical distinctions based on differences between the conceptions of "cruel" and "unusual."

. . . .

We view Appellant's policy arguments in essentially the same light. These emphasize the trend of the United States Supreme Court towards viewing juveniles as a category as less culpable than adults, and, while we recognize this progression, Appellant does not acknowledge that there has been no concomitant movement in this Court or in the Pennsylvania Legislature away from considering murder to be a particularly heinous offense, even when committed by a juvenile.

*Id.* at 298–99.

Lastly, the Indiana Supreme Court also upheld a post-*Miller* LWOP sentence for a juvenile over a state constitutional challenge. *Conley v. State*, 972 N.E.2d 864, 879–80 (Ind. 2012). Under Indiana law, an LWOP sentence may be imposed only after the sentencing court identifies all aggravating and mitigating circumstances, includes the facts and reasons that support those findings, balances those circumstances, and determines the sentence is appropriate. *Id.* at 873. The court must also find at least one aggravating circumstance and that the aggravating circumstances outweigh the mitigating circumstances. *Id.*

The Indiana Supreme Court acknowledged that the Indiana Constitution "can provide more protections than the United States Constitution provides" and its "language is not the same." *Id.* at 879. In particular, the Indiana Constitution states, " 'The penal code shall be founded on the principles of reformation, and not of vindictive justice.' " *Id.* (quoting Ind. Const. art. 1, § 18). Still, the court found no constitutional violation, noting that the defendant was "only the fourth juvenile sentenced to a life-without-parole sentence" in Indiana. *Id.* at 880. The court observed that in Indiana, "[l]ife without parole is reserved

for use in only the most heinous of crimes that so shock our conscience as a community." *Id.*

One state constitutional decision is to the contrary. In *Diatchenko v. District Attorney*, 1 N.E.3d 270, 276, 282–85 (Mass. 2013), the Massachusetts Supreme Judicial Court acknowledged that *Miller* foreclosed only mandatory life-without-parole sentences for juvenile homicide offenders under the Eighth Amendment, yet invalidated all life-without-parole sentences for juveniles in Massachusetts under Article 26 of the declaration of rights in that state's constitution. The relevant provision of that article bars courts from inflicting "cruel or unusual punishments." Mass. Const., pt. 1, art. 26.[11]

The Massachusetts court based its reasoning on two points—first, the inability of courts to determine with a high degree of confidence whether a juvenile offender can or cannot be rehabilitated, and second, the similarity between life without parole and the death penalty (the latter of which the Massachusetts Supreme Judicial Court had previously found to be unconstitutional in all circumstances). *See Diatchenko*, 1 N.E.3d at 283–84. Thus, the court explained,

> Given current scientific research on adolescent brain development, and the myriad significant ways that this development impacts a juvenile's personality and behavior, a conclusive showing of traits such as an "irretrievably depraved character" can never be made, with integrity, by the Commonwealth at an individualized hearing to determine whether a sentence of life without parole should be imposed

---

[11]It is worth noting that the Massachusetts Supreme Judicial Court has declined to hold that a mandatory sentence of life with parole eligibility after fifteen years (in other words, fifteen years of mandatory incarceration) for a juvenile who committed second-degree murder violates either the Eighth Amendment or Article 26 of the Massachusetts Declaration of Rights. *Commonwealth v. Okoro*, 26 N.E.3d 1092, 1098–1101 (Mass. 2015). The court observed that it would be "prudent" to allow the law to develop further. *Id.* at 1101. The court referenced *Lyle* but decided not to follow it. *Id.* at 1100–01 & n.17.

on a juvenile homicide offender. Simply put, because the brain of a juvenile is not fully developed, either structurally or functionally, by the age of eighteen, a judge cannot find with confidence that a particular offender, at that point in time, is irretrievably depraved. Therefore, it follows that the judge cannot ascertain, with any reasonable degree of certainty, whether imposition of this most severe punishment is warranted.

*Id.* (footnote omitted) (citations omitted). The court then added,

When considered in the context of the offender's age and the wholesale forfeiture of all liberties, the imposition of a sentence of life without parole on a juvenile homicide offender is strikingly similar, in many respects, to the death penalty, which this court has determined is unconstitutional under art. 26.

*Id.* at 284. It further observed,

The penological justifications for imposing life in prison without the possibility of parole—incapacitation, retribution, and deterrence—reflect the ideas that certain offenders should be imprisoned permanently because they have committed the most serious crimes, and they pose an ongoing and lasting danger to society. However, the distinctive attributes of juvenile offenders render such justifications suspect. More importantly, they cannot override the fundamental imperative of art. 26 that criminal punishment be proportionate to the offender and the offense.

*Id.* at 284 (citations omitted).

The views of the *Diatchenko* court need to be considered carefully because they distill the case for a categorical ban on life-without-parole sentences for juvenile homicide offenders. The first argument asserts that with juveniles, a sentencer cannot confidently say whether or not a juvenile can be rehabilitated, so the only constitutional outcome is always to allow the possibility of parole. *Id.* at 283–84. The second argument holds that life without parole is simply too harsh and disproportionate a sentence to impose on any juvenile. *Id.* at 284. I will examine these arguments in turn.

3. *Does Iowa's constitution categorically prohibit life without parole for juvenile murderers?* As noted, the Massachusetts Supreme Judicial Court gave two reasons in *Diatchenko* for imposing a categorical ban under the Massachusetts Constitution on life-without-parole sentences for juveniles who commit murder—the inability of courts to determine with confidence whether a juvenile can be rehabilitated, and the overall harshness of the life-without-parole sentence for juveniles. *Id.* at 283–84.

One possible answer to the first argument is that the judicial process is *always* subject to error. Predicting when or whether a person can be rehabilitated is far from a science. Divining when or whether a juvenile can be rehabilitated is even more difficult, as we have previously noted. Yet we have made clear that sentencing courts may impose lengthy periods of required incarceration on juveniles if they do so after considering the mitigating attributes of youth. In *Lyle*, we expressed confidence in our trial judges:

> It is important to be mindful that the holding in this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed, nor does it prohibit the legislature from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole. Article I, section 17 only prohibits the one-size-fits-all mandatory sentencing for juveniles.
>
> . . . .
>
> On remand, judges will do what they have taken an oath to do. They will apply the law fairly and impartially, without fear. They will sentence those juvenile offenders to the maximum sentence if warranted and to a lesser sentence providing for parole if warranted.

854 N.W.2d at 403–04.

Also, *Miller* and its progeny rely heavily on parole boards as the backstop to the process; yet a parole board's determination that someone has or has not been rehabilitated is likewise subject to error.

Furthermore, focusing exclusively on the difficulty of determining at the time of sentencing whether a juvenile can be rehabilitated overstates the scope of *Miller* and our cases. Rehabilitation is not the only legitimate goal served by imprisonment, even for juveniles. Rather, our criminal justice system takes into account retribution, deterrence, and incapacitation as well. *See Oliver*, 812 N.W.2d at 646. If rehabilitation were the sole proper goal, it would follow that all sentences for juveniles should come with immediate parole eligibility. *Miller* does not go that far and does not hold that rehabilitation is the *only* consideration that may govern sentencing of juvenile homicide offenders. It simply holds that because of the capacity of juveniles to reform, and their diminished culpability, the factors of youth must be considered in a discretionary sentencing process.

> Nor does *Lyle* go that far. As we put it in *Lyle*,
>
> The Supreme Court banned mandatory life-without-parole sentences for juveniles in *Miller*, but it did not ban nonmandatory life-without-parole sentences if the sentencing court is given the opportunity to consider the attributes of youth in mitigation of punishment. Thus, juveniles can still be sentenced to long terms of imprisonment, but not mandatorily. Accordingly, the heart of the constitutional infirmity with the punishment imposed in *Miller* was its mandatory imposition, not the length of the sentence.

854 N.W.2d at 401 (footnote omitted) (citations omitted). We observed in *Lyle* that "justice requires us to consider the culpability of the offender *in addition to* [not exclusive of] the harm the offender caused." *Id.* at 398 (emphasis added). Thus, both *Miller* and our cases allow the sentencing

court to consider the nature of the crime, so long as the court also considers all relevant attributes of youth.[12]

I therefore turn to the Massachusetts Supreme Judicial Court's second point. This, I believe, is the heart of Seats's categorical argument—namely, that an LWOP sentence violates article I, section 17 because it is simply too harsh and disproportionate ever to be imposed on a person who commits first-degree murder while under the age of eighteen.

To be sure, in recent years, both the United States Supreme Court and this court have recognized "a fundamental and virtually inexorable difference between juveniles and adults for the purposes of punishment." *Id.* at 393. This difference is presently reflected in Iowa law, which mandates LWOP for adults who commit first-degree murder but provides no mandatory minimum period of incarceration at all for a juvenile who commits the same crime. *Compare* Iowa Code § 902.1(1) (2009), *with* 2015 Iowa Legis. Serv. no. 76 (S.F. 448) (West 2015).

---

[12]*Miller* indicated that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419. It did not say those attributes eliminated the justifications for such sentences. Hence, *Miller* condemned mandatory LWOP laws for juvenile homicide offenders not only because they do not differentiate among juveniles but also because they do not differentiate among homicides:

> Under these schemes, every juvenile will receive the same sentence as every other—the 17–year–old and the 14–year–old, *the shooter and the accomplice*, the child from a stable household and the child from a chaotic and abusive one.

*Id.* at ___, 132 S. Ct. at 2467–68, 183 L. Ed. 2d at 422. (emphasis added). In *Lyle*, we made the same point: "The youth of this state will be better served when judges have been permitted to carefully consider *all of the circumstances of each case* to craft an appropriate sentence and give each juvenile the individual sentencing attention they deserve and our constitution demands." *Lyle*, 854 N.W.2d at 403 (emphasis added).

The question is whether this difference between adults and juveniles is so vast that an LWOP sentence for a juvenile who commits murder has become "off the charts" in all situations. *See State v. Bruegger*, 773 N.W.2d 862, 867, 886 (Iowa 2009) (internal quotation marks omitted) (holding that a mandatory sentence of 21.25 years for an adult who committed statutory rape and had been previously adjudicated a delinquent for two counts of criminal sexual conduct in the first degree was "off the charts" such that a hearing was required to determine the constitutionality of the sentence (internal quotation marks omitted)). I believe it is not.

To begin with, we do not have a situation as in *Roper* where there is a "national consensus" against the punishment. 543 U.S. at 564, 125 S. Ct. at 1192, 161 L. Ed. 2d at 18; *see also Oliver*, 812 N.W.2d at 641–46 (emphasizing the importance of a national consensus). The sentence is not "exceedingly rare" as in *Graham*, 560 U.S. at 67, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841. To the contrary, even in the wake of *Miller*, LWOP remains a statutorily available sentence for juvenile homicide offenders in thirty-six jurisdictions, including Iowa. Legislatively speaking, "Iowa is not an outlier." *Oliver*, 812 N.W.2d at 641.

Also, turning to judicial decisions in other states—another consideration we deemed relevant in *Oliver*, *see id.* at 643—it is noteworthy that almost all post-*Miller* state appellate courts to rule (Massachusetts being the only exception) have upheld as constitutional discretionary life-without-parole sentences for juvenile homicide offenders.

Nor do we have a *Roper*/*Graham* scenario where the sentence may exist more in theory than in practice. *Miller* was decided less than three years ago, yet there at least fifteen cases in which juvenile homicide

offenders have already been sentenced or resentenced, post-*Miller*, to life without parole and the sentences have been upheld on appeal.[13]

---

[13]The Louisiana Court of Appeals recently upheld the imposition of a sentence of life imprisonment without parole on a juvenile convicted of second-degree murder. *State v. Smoot*, 134 So. 3d 1, 2 (La. Ct. App. 2014). The defendant was seventeen years old when he shot a man in a dispute involving drugs and a boom box. *Id.* at 2–4 & n.3. The defendant was sentenced on January 31, 2013, after *Miller* was decided. *See id.* at 5. At the sentencing hearing, defense counsel presented evidence that the defendant came from a broken home, had lived in group homes between ages twelve and fifteen, and was treated by counselors during that time. *Id.* at 6. Before imposing the sentence, the trial court explained its reasoning on the record:

> The trial court stated that it had taken into account the youth of defendant as well as his upbringing and previous criminal activity. Despite defendant's youth, the court found that defendant preyed upon a particularly vulnerable individual who was a homeless, HIV positive drug addict. Further, the court also expressed astonishment that defendant shot this victim multiple times over a stereo.
>
> . . . The court found this conduct demonstrated that defendant had "so little value [for] life" and exhibited a deliberate cruelty to the victim.

*Id.* (alteration in original) (footnote omitted). The defendant challenged the adequacy of the sentencing hearing under *Miller*. *Id.* at 4. The appellate court stated it was "clear that the trial court complied with the principles set forth in *Miller* prior to imposing sentence." *Id.* at 6. Because the court had properly considered both the defendant's youth and any other potentially mitigating factors before imposing life without parole, the court affirmed the defendant's LWOP sentence. *See id*; *see also United States v. Bryant*, ___ F. App'x ___, ___, 2015 WL 1884376, at *1–2 (9th Cir. Apr. 27, 2015) (assuming that *Miller* applied to an eighty-year sentence but upholding the sentence where "[t]he district court understood that it had discretion to depart from a life sentence," "performed an individualized assessment" of the defendant, and was "well informed as to [the defendant]'s troubled upbringing and the mitigating characteristics of youth"); *United States v. Maldonado*, No. 09 Cr. 339–02, 2012 WL 5878673, at *10 (S.D.N.Y. Nov. 21, 2012) (sentencing the juvenile defendant to life imprisonment after considering the defendant was seventeen years old, committed a murder for hire in furtherance of a drug business, had not expressed remorse for his crimes, and had not shown himself to be rehabilitatable while incarcerated), *aff'd sub nom. United States v. Guerrero*, 560 F. App'x 110, 112 (2d Cir. 2014); *Palafox*, 179 Cal. Rptr. 3d at 795–97, 805–06 (approving of LWOP sentence of juvenile offender who was resentenced under *Miller* where the court weighed the defendant's youth, but found it outweighed by the brutality of the crimes); *Lane v. State*, 151 So. 3d 20, 20–21 (Fla. Dist. Ct. App. 2014) (affirming the juvenile defendant's LWOP sentence for second-degree murder because the trial court "conducted an individualized mitigation inquiry" (internal quotation marks omitted)); *Copeland v. State*, 129 So. 3d 508, 510 (Fla. Dist. Ct. App. 2014) (upholding defendant's sentence to LWOP after *Miller* where the defendant was only months shy of being eighteen, had no drug or family problems, had a prior criminal history, and murdered a fifteen-year-old victim); *Bun*, 769 S.E.2d at 383–84 & n.5

A statewide consensus against this punishment cannot be discerned either. As I've mentioned above, during the recently adjourned

_____

(rejecting the defendant's facial challenge to his LWOP sentence and noting that even if he had raised an as-applied challenge, "the trial court's order and sentencing transcript make clear that the trial court considered Bun's youth and its accompanying attributes in making its sentencing decision and whatever the significance attributed to Bun's youth, the trial court found it was outweighed by the severity of his crimes, his criminal history, and his lack of remorse"); *State v. Wilson*, ___ So.3d ___, ___ 2015 WL 1955410, at *9–10 (La. Ct. App. Apr. 29, 2015) (affirming the defendant's sentencing to LWOP despite the defendant's "lack of parental guidance, his placement in special education classes, and the impact of peer pressure on him" and stating that "*Miller* does not require the sentencing court to articulate all mitigating factors on the record"); *Fletcher*, 149 So. 3d at 936, 949–50 (affirming the defendant's resentencing to LWOP where the fifteen-year-old offender "executed his own parents in cold blood" despite a good upbringing, expressed no genuine remorse, threatened his sister, and was unlikely to be rehabilitated); *State v. Reese*, No. 2013 KA 1905, 2014 WL 3843859, at *3–5 (La. Ct. App. June 25, 2014) (upholding the juvenile defendant's sentence of LWOP where the court considered the defendant was almost seventeen, demonstrated little potential for rehabilitation, had a favorable upbringing, and murdered an innocent, younger child); *State v. Brooks*, 139 So. 3d 571, 575 (La. Ct. App. 2014) (approving of seventeen-year-old defendant's resentencing under *Miller* to LWOP where the trial court considered the defendant's age, that he lacked an explanation for the senseless murder, that he failed to comprehend he had escalated the situation and endangered many lives, that he lacked remorse, and the impact of the crime on the fifteen-year-old victim's family); *State v. Lovette*, 758 S.E.2d 399, 408 (N.C. Ct. App. 2014) (upholding the juvenile defendant's LWOP sentence following resentencing post-*Miller* because the trial court properly weighed all the factors and, despite stating defendant was not irretrievably corrupt, still determined a life sentence was appropriate); *State v. Rafferty*, No. 26724, 2015 WL 1932693, at *29–30 (Ohio Ct. App. Apr. 29, 2015) (upholding an LWOP sentence for a sixteen-year-old boy who aided and abetted a man in his fifties in robbing and murdering three persons, even though the boy "came from a broken home" and he was "more susceptible to being influenced" by the man, where "there was nothing reckless or impetuous" about the murders and the district court "separately considered [the defendant]'s youth as a mitigating factor"); *State v. Lane*, No. 2013–G–3144, 2014 WL 1900459, at *15–16 (Ohio Ct. App. May 12, 2014) (affirming the trial court's decision to sentence the juvenile defendant to life without parole where the defendant killed three students in a school shooting without provocation, he was seventeen and one-half years old, he was intelligent and knew what he did was wrong, he had a tumultuous upbringing, he was not pressured into committing the crime, and he demonstrated no remorse, but rather contempt for his victims' families, at sentencing); *Commonwealth v. Seagraves*, 103 A.3d 839, 847–49 (Pa. Super. Ct. 2014) (affirming the defendant's resentencing after the *Miller* decision where the court considered his age, mental health, drug history, maturity, lack of capacity to be rehabilitated, the brutality of the crime, his closeness to adulthood, his lengthy juvenile record, his primary role in the premeditated crime, lack of peer pressure, and decent upbringing and determined LWOP was warranted).

legislative session the general assembly by large bipartisan majorities approved a *Miller* fix that leaves life without parole as a sentencing option for juveniles who commit first-degree murder.

Of course, this court must also make an independent judgment whether a sentence violates the constitution. *Lyle*, 854 N.W.2d at 398; *Oliver*, 812 N.W.2d at 646. A fundamental consideration here is whether the sentence serves legitimate penological goals. *Lyle*, 854 N.W.2d at 398; *Oliver*, 812 N.W.2d at 646. Clearly, an LWOP sentence serves no rehabilitative goal. *Oliver*, 812 N.W.2d at 646. And while retribution is certainly a permissible goal of punishment, there must be a relationship between the punishment and the defendant's culpability. *Id.*

Juveniles do not have "adult-like culpability." *Lyle*, 854 N.W.2d at 398. Still, the intentional, premeditated taking of another person's life is the most serious offense a person can commit, and society is entitled to recognize this point, even when the person committing the crime was under the age of eighteen. I cannot say that life without parole falls so far short of serving legitimate penological goals in all cases involving juvenile homicide offenders as to be "cruel and unusual" within the meaning of article I, section 17.

"[W]e owe substantial deference to the penalties the legislature has established for various crimes." *Oliver*, 812 N.W.2d at 650. The issue for me is not whether I agree with this particular sentence, any more than that was the issue when my predecessors decided *Dooley* over a century ago. *See* 89 Iowa at 594, 57 N.W. at 417. The issue is whether the Iowa Constitution imposes a total ban on life-without-parole sentences for juvenile murderers. I am unable to say that LWOP is such a disproportionate penalty in all instances for a person who commits a

murder before reaching the age of eighteen that it violates the Iowa Constitution.

**F.  The Court's Failure to Reach Seats's Categorical Challenge.**
Unfortunately, the court does not reach the question whether article I, section 17 prohibits LWOP sentences for juvenile murderers in all cases. That means the issue will have to continue to be litigated in Iowa.  I do not understand or agree with the court's refusal to reach this issue.

For one thing, there is precedent for our upholding a law against a facial challenge while at the same time finding the law unconstitutional as applied.  *Glowacki v. State Bd. of Med. Exam'rs*, 501 N.W.2d 539, 541–42 (Iowa 1993); *cf. State v. Hernandez-Lopez,* 639 N.W.2d 226, 235, 242 (Iowa 2002) (upholding material witness law against facial challenge because it raised "issues of public importance" even while dismissing the as-applied challenge as moot).

Even more importantly, the categorical challenge and the as-applied challenge do not afford Seats the same relief.  If Seats prevailed on his categorical challenge, he could not be sentenced to LWOP. However, the court's ruling leaves Seats subject to an LWOP sentence on remand.  Thus, it grants Seats less relief than a successful categorical challenge to the Iowa statute would provide.  It is not fair or logical for an appellate court to say it is unnecessary to reach an appellant's first ground for appeal just because the court is reaching another ground that provides more limited relief.  This is like remanding a case for new trial based on an instructional error while ignoring the appellant's initial argument that he or she should have received a directed verdict.

Texas has a well-developed and well-reasoned body of law on this issue.  "Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those

points that would afford the party the greatest relief." *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999); *cf. Boykins v. Shinseki*, No. 13–0942, 2014 WL 840096, at *5 (Vet. App. Mar. 5, 2014) ("Given that the Court is remanding the appellant's claim, and because none of the appellant's other allegations of error could result in greater relief, the Court need not address the appellant's remaining arguments."); *Tischhauser v. Little*, 296 P.2d 1118, 1119 (Kan. 1956) (reversing and remanding for a new trial because of an evidentiary error, finding that it was not error to overrule the appellant's directed verdict motion, and declining to reach the appellant's other appellate arguments because they were also arguments for a new trial and "could afford appellant no greater relief than that already granted"). There is no juridical or practical reason to avoid reaching the question whether the Iowa Constitution categorically forbids the imposition of an LWOP sentence on a juvenile who commits murder.

**III. Seats's As-Applied Challenge to His Life-Without-Parole Sentence.**

Seats's other ground for appeal is his as-applied challenge to his sentence. He maintains that even if LWOP (or its functional equivalent) for juveniles who commit murder does not categorically violate the Iowa Constitution, his particular LWOP sentence did not comply with the requirements of *Miller*, *Ragland*, and *Null*.[14]

**A. The Majority's Criticisms of the District Court.** Although the district court clearly tried to follow *Miller* and our caselaw, my

---

[14]Seats did not raise the type of as-applied challenge to his sentence recognized in *Bruegger*, 773 N.W.2d at 884–85. He did not argue that the sentence of life without parole is disproportionate as applied to him. Rather, he relied on the principles relating specifically to juvenile sentencing set forth in *Miller* and our subsequent juvenile sentencing cases.

colleagues fault the court for not doing the job well enough. They therefore send the case back for more work—or, I would argue, the same work. The majority identifies four *Miller/Ragland/Null* "factors" the court allegedly did not consider: (1) "the presumption" in favor of a sentence less than life without parole; (2) the juvenile offender's " 'family and home environment' "; (3) the " 'circumstances of the homicide offense' "; and (4) the "consideration that '[j]uveniles are more capable of change than adults.' " (Alteration in original.) (Internal quotation marks omitted.).

Additionally, the court offers three further criticisms of the district court:

(5) The court should not have "emphasized that Seats was a seventeen-year-old at the time the crime was committed."

(6) The court needed to "make specific findings of fact discussing why the record rebuts the presumption" against life without parole.

(7) The court "appeared to use Seats's family and home environment vulnerabilities together with his lack of maturity, underveloped sense of responsibility, and vulnerability to peer pressure as aggravating, not mitigating factors."

I do not agree with any of these seven criticisms. In fact, I think these criticisms are quite unfair. Let's compare what the majority *claims* the district court didn't do and what the district court *actually* did:

1. *Alleged failure to apply the presumption against LWOP.* The district court did not overlook this factor. To the contrary, the court acknowledged that it must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (Internal quotation marks omitted.). The district court also accepted that "only in the unusual case should a juvenile life sentence without the possibility for parole be imposed." It then expressly

determined that "this case is one of those unusual cases," following this determination with several paragraphs of findings.

2. *Alleged failure to consider the juvenile offender's family and home environment.* The district court did not disregard Seats's family and home environment. It said,

> I have considered the defendant's unfortunate background and the difficulties he faced in his youth. I am not unsympathetic to the bleakness and desperation of that life. But I fail to find here the "attendant characteristics" of youth that might outweigh the seriousness of the crime or otherwise require a sentence less than one that would be imposed on an adult.

3. *Alleged failure to consider the circumstances of the offense.* Again, this criticism is misplaced. Here is what the district court stated:

> As to the crime, Mr. Seats shot a man asleep on a couch. Mr. Seats was not provoked, it was not a situation of a conflict that got out of control, and there is no arguable issue of self-defense. Mr. Seats was a primary actor in the murder and not a bystander who got caught up in events. He then took a series of proactive communications after his arrest, and he was demonstrably able to assist in his own defense at trial. Mr. Seats still does not acknowledge his guilt, show remorse for the crime he committed or demonstrate concern for the victim or the victim's family.

4. *Alleged failure to consider that juveniles are more capable of change than adults.* The district court did not miss this factor, either. As noted above, it acknowledged *Miller*'s teaching regarding "the 'attendant characteristics' of youth." Yet it also observed that Seats had not changed in over four years as an adult, had incurred ten major disciplinary reports in prison, and continued to deny his guilt and showed no remorse for the crime committed.

5. *Alleged emphasis on Seats being nearly eighteen years old when the crime was committed.* It is true that a single sentence of the district court's order said, "When he killed [Cervantes], Mr. Seats was only

months away from being an adult." I would not consider one sentence to be emphasis. Furthermore, *Miller* and *Ragland* instruct sentencing courts that they should consider the juvenile's "chronological age." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423; *Ragland*, 836 N.W.2d at 115 n.6 (internal quotation marks omitted). *Miller* even characterized its holding as "requir[ing] factfinders . . . to take into account the differences among defendants and crimes," including the distinction between seventeen year olds and fourteen year olds. *Miller*, 567 U.S. at ___ n.8, 132 S. Ct. at 2469 n.8, 183 L. Ed. 2d at 424 n.8. So it was entirely appropriate for the district court to make reference to Seats's age at the time of the murder.

6. *Alleged failure to make specific findings to overcome the presumption against LWOP*. I do not understand this criticism. The district court made a specific finding that this was "one of those unusual cases [where LWOP could be imposed]," and then gave several paragraphs' worth of findings and reasons.

7. *Alleged use of Seats's family and home environment vulnerabilities together with his lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure against him*. I do not follow this criticism either. The district court expressly found that this murder did not arise out of peer pressure; rather, Seats was "a primary actor." The district court also acknowledged Seats's "unfortunate background," "the difficulties he faced in his youth," and "the bleakness and desperation of [Seats's] life" as mitigating factors, but found them outweighed by other considerations it identified.

*Miller* does not require that we take the general characteristics of hardened criminals—such as their inability to acknowledge wrongdoing, their lack of remorse, their continuing illegal activity, and their failure to

respond to interventions and attempts at rehabilitation—and treat them as items to be placed on *the defendant's* side of the ledger.

For all these reasons, in contrast to the majority, I do not believe a remand is necessary for more fact-finding.

**B. Seats's Argument that His Case Was Not Heinous Enough.**
Seats's as-applied challenge also has a substantive dimension not addressed by the majority. Thus, apart from the question whether the district court followed the proper procedure in resentencing him, Seats maintains that "his case does not rise to the heinous level" where *Miller* permits an LWOP sentence.

To date, other jurisdictions have been divided on whether *Miller*'s sentencing requirements are basically procedural or whether there is also a substantive component. Under the former approach, the appellate court's duty is to determine whether the sentencing court took the youth-related factors into account, not to analyze whether the court's findings and ultimate conclusion are actually supported by the evidence. *See, e.g., United States v. Guerrero*, 560 F. App'x 110, 112 (2d Cir. 2014) (affirming the defendant's resentencing to life without parole because "[t]he district court properly considered all of the *Miller* factors"); *Copeland v. State*, 129 So. 3d 508, 511 (Fla. Dist. Ct. App. 2014) ("[T]he sentencing court conducted an individualized mitigation inquiry, considering several potential mitigating factors before finding that life without the possibility of parole was, nevertheless, appropriate in this case. Accordingly, we AFFIRM Copeland's judgment and sentence."); *Commonwealth v. Seagraves*, 103 A.3d 839, 850 (Pa. Super. Ct. 2014) ("Because our review of the record readily reveals that the trial court considered these factors before re-imposing the sentence, we affirm Appellant's life sentence without the possibility of parole.").

But another group of appellate courts have undertaken to review the record to determine not only whether the sentencing court considered the correct factors, but also whether its findings are supported by the evidence such that the case is truly an "uncommon" one. Hence, in *Palafox*, the California Court of Appeal performed its own "independent review." 179 Cal. Rptr. 3d at 806. The court elaborated,

> [W]e have subjected the constitutionality of the sentence to our independent review, taking into consideration defendant's age and its hallmark features, record information regarding defendant's family and home environment, and record evidence and information regarding the circumstances of the murders, including whether substance abuse played a role. We have considered whether defendant's youth had any effect on how he was charged or whether he was somehow disadvantaged in the criminal proceedings, but find no evidence or information suggesting this factor is applicable to defendant's case. Finally, we have examined the record for any evidence or other information bearing on the possibility of rehabilitation. Other than defendant's age and lack of past criminal history, we find none—only speculation. Speculation is insufficient to render unconstitutional a sentence that otherwise passes constitutional muster.

*Id.* (footnote omitted) (citations omitted). In a footnote, the court referred to the defendant's "chaotic and unfortunate upbringing and environment," but noted the same report "did not address any potential for rehabilitation." *Id.* n.17.

Likewise, the North Carolina Court of Appeals examined for itself whether the trial court's findings of fact were supported by substantial evidence and whether they supported the trial court's ultimate conclusion. *See State v. Lovette*, 758 S.E.2d 399, 407–10 (N.C. Ct. App. 2014). Upon its review, the court found the facts did support an LWOP sentence: "[T]his case is uncommon." *Id.* at 410. In its opinion, the appellate court recited some of the pertinent facts, including the "defendant's active planning and participation in a particularly senseless

murder," the fact that the defendant was seventeen years old and "of a typical maturity level for his age," the fact that the defendant had a stable upbringing, and his extensive juvenile record despite the rehabilitative programs offered by the juvenile court. *Id.*

Similarly, in *Fletcher*, the Louisiana court conducted its own "complete and thorough review of the entire record of all of the proceedings, including all of the testimony and evidence adduced at the trial and the *Miller* hearing, and all of the exhibits introduced in these proceedings." 149 So. 3d at 944. Convinced that the trial court had considered "the relevant factors," and fortified by its own "careful review of the entire record," the court upheld the trial court's resentencing of the defendant to life without parole. *Id.* at 950; *see also State v. Brooks*, 139 So. 3d 571, 576 (La. Ct. App. 2014) (sharing the trial court's conclusion "that the facts of this case should preclude parole eligibility for this remorseless killer").

I agree with the approach taken by the latter group of courts. *Miller*—especially as amplified by our holdings under the Iowa Constitution—requires us to perform a substantive as well as a procedural review of any juvenile LWOP sentence. Thus, when reviewing any such sentence, I would consider whether the district court's findings on the *Miller/Ragland/Null* factors are supported by substantial evidence, and also independently decide whether the record supports a determination that the case is sufficiently uncommon—based on those same factors—that an LWOP sentence can be constitutionally imposed.

This leads to the question of what the standard of review should be. The State urges abuse of discretion—our traditional deferential standard for reviewing criminal sentences. I disagree. Abuse of discretion might be the right standard if the only question were whether

the district court considered the appropriate factors—the typical inquiry in sentencing appeals. *See State v. Valin*, 724 N.W.2d 440, 444 (Iowa 2006) (stating that the standard of review for sentencing appeals is abuse of discretion when a sentence falls within statutory limits). However, if the review is to go beyond procedure, a less deferential standard of review is required.

Accordingly, I think this court should examine whether the district court's findings on any *Miller/Ragland/Null* factors are supported by substantial evidence, and perform a de novo review to determine whether a case is sufficiently uncommon, based upon consideration of those factors, that a sentencer could constitutionally impose a life-without-parole sentence. The issue, again, would not be whether the appellate court would have imposed the same sentence, but whether there are sufficient indicia the case is out of the mainstream of juvenile homicide cases that an LWOP sentence is a constitutional option.[15]

I believe the district court's findings of fact at the resentencing are supported by substantial evidence; indeed, Seats does not challenge any of them on appeal. I would also conclude from an independent review that this is the kind of rare case where a district court, exercising its discretion and after considering all the circumstances of youth presented, could constitutionally impose an LWOP sentence.

First, the defendant's chronological age was just a few months short of eighteen. He did not act impetuously. A murder—really an

---

[15]I do not believe the determination of whether the case is "uncommon" requires a particular factual finding, as opposed to a balancing of factors. If a particular factual threshold had to be met, a serious question would be raised whether the life-without-parole sentence must be imposed by a jury rather than a judge. *See Fletcher*, 149 So. 3d at 942–43; *see also Blakely v. Washington*, 542 U.S. 296, 303–04, 124 S. Ct. 2531, 2537, 159 L. Ed. 2d 403, 412–13 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362–63, 147 L. Ed. 2d 435, 455 (2000).

execution—was planned; Seats's purpose was to kill someone he was worried would go to the police and report him.

Second, as to the circumstances of the murder, Seats was the gunman, and he "emptied the whole clip" into a man who was sleeping a few feet away. Seats was not under the influence of any substances. He was not provoked; he did not act in self-defense or the heat of passion; he planned the killing under his own initiative without any peer pressure.

Third, there is no indication Seats's youth had any bearing on his ability to defend himself in the legal system. In fact, Seats was no longer a juvenile at the time of trial. Nothing in the record suggests that any plea offer was made to Seats before trial, let alone turned down by him because of his youth. At trial, Seats took the stand and testified for most of a day, presenting a detailed, if ultimately unconvincing, defense that was designed to conveniently explain away a good deal of the prosecution's evidence.

Fourth, while most young people change and mature as they get older, the district court accurately summarized this record as not showing any discernible prospects for rehabilitation. All rehabilitation efforts failed when Seats was a juvenile.[16] In prison, Seats had only made what the district court accurately termed a "half-hearted effort at obtaining his GED."[17] Further, as noted by the district court, Seats

---

[16]The record reveals, for example, that Seats was placed in a highly structured, ninety-day boot camp program in Davenport from October 2006 through January 2007.

[17]The district court expressly acknowledged that there exist "few opportunities" to "ma[k]e significant rehabilitative efforts in prison," but was skeptical of Seats's claim that he had to put aside any efforts toward getting a GED because of other priorities. The PSI indicates that Seats was accepted into a GED program in 2010 but left the program two years later without a GED because of "[n]oncompliant/[b]ehavioral [i]ssues."

failed to show remorse up to the day of his resentencing. Four years after the crime, at the age of twenty-two, Seats continued to deny that he killed Cervantes. Even when he briefly admitted the crime to police, his only regret was that he had shot Cervantes rather than Ramirez.

It is true that one factor weighs quite significantly in Seats's favor—his seriously troubled family and home environment. The district court acknowledged and considered this point, as it had to. I believe this factor alone, though, does not render an LWOP sentence unconstitutional under the circumstances of this case. Other courts have reached similar conclusions.[18]

The present case stands a considerable distance from the botched robberies committed by fourteen year olds that were involved in *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. at 420, the impulsive stabbing of a client committed by a teenage model who later became an exemplary inmate, *State v. Louisell*, ___ N.W.2d ___, ___ (Iowa 2015), and the fatal blow with the tire iron that was struck in a fight by someone other than the defendant, *Ragland*, 836 N.W.2d at 110.

---

[18]A number of courts applying the principles of *Miller* have agreed that life without parole can be an appropriate sentence for some juvenile defendants despite their troubled family and home life. *See Palafox,* 179 Cal. Rptr. 3d at 793–94 (affirming life without parole for murders committed by the defendant when he was sixteen, despite "the family's issues with drugs, alcohol, gangs, domestic violence, and delinquent activities"); *Brooks,* 139 So. 3d at 573–74 (affirming life without parole despite the very difficult family history of the defendant who dropped out of school at fourteen and whose parents dealt and used drugs); *Smoot,* 134 So. 3d at 5–6 (upholding a juvenile defendant's life-without-parole sentence despite defense counsel's presentation of evidence that the defendant "came from a broken home" and lived in a group home for a period of his youth); *Lane,* 2014 WL 1900459, at *15–16 (considering the juvenile defendant's "tumultuous upbringing" but affirming the life-without-parole sentence for a school shooter who planned the attack and showed a complete lack of remorse at sentencing); *Rafferty,* 2015 WL 1932693, at *29 (affirming the defendant's LWOP sentence despite the fact that he "came from a broken home" and was sixteen years old at the time of the murders, he was not the gunman, and he was under the influence of a much older man who was the gunman).

Given the deference we must afford on the one hand to the legislature's determination of sentencing options and on the other hand to the trial court's exercise of sentencing discretion, I would not find this sentence violates either the Eighth Amendment or article I, section 17 of the Iowa Constitution.

## IV. Conclusion.

For the foregoing reasons, I respectfully dissent and would affirm the resentencing below.[19]

Waterman and Zager, JJ., join this dissent.

---

[19]One final note: Seats has not raised a supplemental argument that he is entitled to resentencing *because of* the 2015 legislation, which was enacted before his 2013 sentence became final. Nevertheless, if this case is to be remanded anyway for another resentencing, as the majority concludes, I believe the district court should apply the 2015 law for the reasons stated in my concurrence in part, dissent in part in *Louisell*, ___ N.W.2d at ___.